**Robert COATES, et al., Plaintiffs,**

**v.**

**HEARTLAND WIRELESS COMMUNI-CATIONS, INC., et al., Defendants.**

**No. Civ.A. 3:98–CV–0452–D.**

United States District Court,
N.D. Texas,
Dallas Division.

June 16, 2000.

Roger F. Claxton, Robert J. Hill, Claxton & Hill, PLLC, Dallas, TX, for plaintiffs.

Ralph I. Miller, Penny P. Reid, Robert R. Summerhays, Weil, Gotshal & Manges LLP, Dallas, Texas, Joseph S. Allerhand, Weil, Gotshal & Manges, LLP, New York City, for defendants.

FITZWATER, District Judge.

In this securities fraud action, the court is again called upon to decide whether plaintiffs have adequately pleaded scienter. Concluding that they at most allege a reasonable, but not strong, inference of the required state of mind, the court grants defendants' motion to dismiss.

## I

Plaintiffs Robert Coates and Management Insights, Inc. purchased 504,000 shares of common stock in defendant Heartland Wireless Communications, Inc. ("Heartland") during the period December 18, 1996 through February 28, 1997. Heartland was a developer, owner, and operator of wireless cable television systems, primarily in the central United States, that targeted small to mid-size markets inadequately served by hard-wire cable companies. It commenced operations in 1993 and went public in 1994. Heartland was one of several competitors in the wireless markets, but was considered during the relevant time period to be the largest and most successful based on an ever-increasing reported subscriber base. It reported dramatic growth in number of subscribers, which in turn fueled glowing analyst reports that were disseminated to the market.

On March 20, 1997 Heartland announced that it was writing down its subscriber base by approximately 25% and taking a number of charges, including one for $5.2 million for bad debt expense and reserve for uncollectible accounts receivable. Plaintiffs allege that most if not all of these writeoffs should have been taken no later than September 30, 1996, and that Heartland should have disclosed the necessity for writeoffs, or the circumstances that led to the them, no later than November 14, 1996, when Heartland announced third quarter 1996 results, or by February 7, 1997, when Heartland's Board of Directors met to discuss the company's financial condition. They allege that defendants engaged in a scheme to misrepresent and conceal the adverse truth regarding Heartland's success and financial condition to inflate artificially the market price of Heartland common stock. Plaintiffs assert that the misrepresentations and omissions concerned two distinct but related areas of Heartland's business: subscriber count and the growth thereof, and revenue and financial condition (accounts receivable). They aver that defendants intentionally misrepresented and failed to disclose the number of subscribers and misrepresented Heartland's financial performance. According to plaintiffs' second amended complaint ("amended complaint"), defendants failed to disclose and concealed these facts in a Heartland November 14, 1996 press release, various other press releases issued before the March 20, 1997 announcement, Heartland's Form 10–Q for the quarter ended September 30, 1996, its 1996 Form 10–K, its December 1996 debt offering prospectus, and its February 1997 debt offering prospectus.

Plaintiffs bring this fraud-on-the-market securities fraud action against Heartland,

which is now bankrupt,[1] David E. Webb, L. Allen Wheeler, John R. Bailey, Alvin H. Lane ("Lane"), John A. Sprague ("Sprague"), and J.R. Holland, Jr. (hereafter, "defendants" or "the individual defendants"), who are present or former Heartland officers and/or directors. Plaintiffs maintain that Heartland and the individual defendants are liable for violating § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. They allege that all the individual defendants except Lane are also liable under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), as controlling persons.

The court has twice dismissed this case for pleading deficiencies. In *Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d 910 (N.D.Tex.1998) ("*Coates I*"), the court held that plaintiffs had engaged in impermissible group pleading, *id.* at 916, and that they had failed adequately to plead scienter, *id.* at 918–922. Although the court granted defendants' motion to dismiss, it allowed plaintiffs to replead. *Id.* at 923. In *Coates v. Heartland Wireless Communications, Inc.*, 55 F.Supp.2d 628 (N.D.Tex.1999) ("*Coates II*"), the court dismissed plaintiffs' first amended complaint on the ground that they had failed adequately to plead scienter. *Id.* at 645. It again allowed them to replead. *Id.* at 633, 646. Plaintiffs have since amended their complaint, and the individual defendants move to dismiss, arguing in pertinent part that plaintiffs have failed adequately to plead scienter.[2]

## II

### A

■ Scienter—a mental state embracing intent to deceive, manipulate, or defraud[3]—is an essential element of a securities fraud claim under § 10(b) of the Exchange Act and Rule 10b–5. *See Melder v. Morris*, 27 F.3d 1097, 1100 (5th Cir. 1994). Section 10(b) proscribes knowing or intentional conduct. *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir.1999).

■ The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, requires that "the complaint shall, with respect to each act or omission ... state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2) (emphasis added). "[T]he PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his

1. Due to the automatic stay, the court has administratively closed the case as to Heartland. In their amended complaint, plaintiffs assert claims directly against Heartland only for purposes of establishing control person liability against the other defendants. *See* Am.Compl. ¶ 23.

2. The individual defendants also maintain that plaintiffs have engaged in impermissible group pleading. The court agrees. In view, however, of the continuing split among the district courts concerning whether the group pleading doctrine survived enactment of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4, *compare, e.g., In re CIENA Corp Sec. Litig.*, 99 F.Supp.2d 650, 663 n. 11 (D.Md.2000) (stating in *dicta* that application of group pleading doctrine to non-speaking defendants "would

seem to be inconsistent with the strict pleading requirements of the PSLRA" (citing *Coates I*, 26 F.Supp.2d at 916)) *with, e.g., In re American Bank Note Holographics, Inc. Sec. Litig.*, 93 F.Supp.2d 424, 442 (S.D.N.Y.2000) (holding that "nothing in the PSLRA has altered that doctrine"), the absence of a controlling Fifth Circuit decision on the permissibility of group pleading, and the fact that the court would still be required to address the individual defendants' liability under § 20(a) of the Exchange Act as controlling persons (plaintiffs' improper use of group pleading does not alone entitle Heartland to dismissal), the court will rest its decision on plaintiffs' failure to plead scienter.

3. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

complaint in order to survive a motion to dismiss." *Comshare*, 183 F.3d at 548–49. "[I]nferences of scienter do not survive if they are merely reasonable.... Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and '*strong*' inferences." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195–96 (1st Cir.1999) (footnote omitted); *see id.* at 197 ("It is clear that scienter allegations now must be judged under the 'strong inference' standard at the motion to dismiss stage."). "In the guise of tinkering with procedural requirements, Congress has effectively, for policy reasons, made it substantively harder for plaintiffs to bring securities fraud cases, through the 'strong inference' of scienter requirement." *Id.* at 196 n. 9; *see Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 620 (4th Cir.1999) ("the [PSLRA] indisputably seeks to make pleading scienter more difficult for plaintiffs"). "Congress enacted the PSLRA to deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973 (9th Cir.1999).

■ Although the circuits have diverged in their understandings of the effect of the PSLRA on previously-recognized methods of pleading scienter, *see Greebel*, 194 F.3d at 199 ("The effect of the PSLRA on the standard for scienter has been much disputed."), this court held in *Coates II* that plaintiffs can allege scienter based on strong circumstantial evidence of conscious behavior or severe recklessness, or based on motive and opportunity. *Coates II*, 55 F.Supp.2d at 635, 640, 642. Absent controlling Fifth Circuit authority to the contrary, the court will evaluate plaintiffs' amended complaint under all these methods.

Regardless which method is employed to plead scienter, the PSLRA mandates that plaintiffs state with particularity facts that give rise to a *strong inference* that the defendant acted with the required state of mind. *See* 15 U.S.C. § 78u–4(b)(2).[4] This court must interpret the statute according to the plain meaning of its words. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). "When a statute does not define its terms, we employ the ordinary meaning of the words." *Silicon Graphics*, 183 F.3d at 983 (defining words "facts" and "particularity" in PSLRA by examining dictionary definitions); *see Hulsey v. USAir, Inc.*, 868 F.2d 1423, 1427 (5th Cir. 1989) ("Where possible, courts interpret the words of statutes 'in their ordinary, everyday sense.' ").

■ BLACK'S LAW DICTIONARY defines "inference" as "[a] conclusion reached by considering other facts and deducing a logical consequence from them." BLACK'S LAW DICTIONARY at 781 (7th ed.). The adjective "strong" is defined, in its relevant sense, as "[p]ersuasive, effective, and cogent." WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY at 1149. Therefore, for securities fraud plaintiffs to plead a *strong inference* of the required state of mind, they must allege with particularity facts that, assumed to be true, constitute persuasive, effective, and cogent evidence from which it can logically be deduced that defendants acted with intent to deceive, manipulate, or defraud.

### B

Plaintiffs have elaborated in some respects on the scienter allegations of their first amended complaint, but the foundations for their theories remain essentially unchanged.

---

4. It can be plausibly argued that no particular method of pleading scienter is required or even preferable under the PSLRA, provided the complaint states with particularity specific facts that give rise to a strong inference that the defendant acted with the required state of mind, and complies with Rule 9(b). *See Greebel*, 194 F.3d at 195 (concluding that "the words of the [PSLRA] neither mandate nor prohibit the use of any particular method to establish an inference of scienter.").

They posit that defendants engaged in conscious and/or severely reckless behavior by misrepresenting Heartland's subscriber count and the growth of its subscriber base. According to the amended complaint, defendants knew that a material number of subscribers/customers were nonexistent, had quit paying their bills, and/or either already had or would soon have their service disconnected. They failed to disclose that a material number of reported subscribers were residents of multiple dwelling units ("MDUs"), with which Heartland had contracts with management to offer wireless services, but the residents of which were not personally signed up for service; persons whose bills were materially past due and would be disconnected; and/or persons whose service had already been disconnected due to non-payment.

Plaintiffs maintain that defendants misrepresented Heartland's financial performance, assets, accounts receivable, and revenue. They assert in the amended complaint that defendants were aware that a material amount that Heartland carried (without reserve) on its books as accounts receivable was attributable to accounts that were materially past due and/or accounts for which service had already been, or would be, disconnected. They knew, or were severely reckless in not knowing, that Heartland's receivables and assets included uncollectible receivables that were 60 or more days overdue and unrecoverable arrearages from customers whose service had already disconnected. Defendants knew, but failed to disclose and concealed, that Heartland was counting such revenue despite actual collection experience and direct knowledge that customers who were more than 60 days past due would in all reasonable probability never pay, and that collection efforts were not economically feasible, manageable, or even being considered by management.

Plaintiffs allege that defendants consciously, or with severe recklessness, misrepresented and concealed Heartland's actual growth and prospects and the value of its assets and financial condition. Defendants understood that Heartland's accounts receivable, assets, and subscriber count were substantially overstated and that absent disclosure, buyers of Heartland stock would be misled or, by not disclosing such information, defendants created a danger of misleading stock purchasers that involved an extreme departure from the standards of ordinary care. Defendants violated Generally Accepted Accounting Principles ("GAAP"), the duty to speak the whole truth having chosen to speak, and SEC Regulation S–X, 17 C.F.R. § 210.4–01(a)(1).

Plaintiffs maintain that defendants were motivated to commit securities fraud because they wanted to market Heartland as a lucrative acquisition candidate, to permit Heartland to acquire new systems and companies, and to ensure the success of a $125 million note offering in December 1996, and because defendant Sprague's company owned convertible Heartland stock from which it could profit if Heartland stock moved above a certain per share price.[5]

### III

The court considers first whether plaintiffs have adequately pleaded scienter based on strong circumstantial evidence of conscious behavior or severe recklessness.

### A

A plaintiff can plead a strong inference of the required state of mind "by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir.1994).

---

**5.** If plaintiffs purport to plead motive on other grounds, these are the only motives that they argue in their response brief and are thus the ones preserved for court review.

Conscious behavior is a "more stringent standard." *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1019 n. 3 (5th Cir.1996). "Conscious behavior, of course, means conscious *mis*behavior." *Coates II,* 55 F.Supp.2d at 635; *see Maldonado v. Dominguez,* 137 F.3d 1, 9 (1st Cir.1998) (concluding that conscious misbehavior requires strong inference that defendant knew statement or omission was false or misleading); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir.1997) (holding that plaintiff must plead strong circumstantial evidence of conscious misbehavior).

■ Scienter can also be pleaded based on strong circumstantial evidence of severe recklessness. Severe recklessness "is 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 521 (5th Cir. 1993) (quoting *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961–62 (5th Cir.1981) (en banc)). "A defendant's omissions or misrepresentations are severely reckless only if they (1) involve an extreme departure from the standards of ordinary care, and (2) present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Lovelace,* 78 F.3d at 1018 n. 2. "The facts alleged to support recklessness must be 'strong circumstantial evidence' of that recklessness" and " 'must, in fact, approximate an actual intent to aid in the fraud being perpetrated.'" *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996) (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995), and *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 121 (2d Cir.1982)); *see Greebel,* 194 F.3d at 199 (noting that recklessness does not encompass ordinary negligence and is closer to lesser form of intent).

## B

The court must decide whether plaintiffs have pleaded scienter based on the allegation that defendants misrepresented Heartland's subscriber count. This assertion has three components: Heartland improperly counted MDU residents who had not personally signed up for service, persons to whom service had already been disconnected due to non-payment of bills, and persons who were materially past due on their bills and would be disconnected.

### 1

■ In *Coates II* the court held that plaintiffs had failed to plead a strong inference of fraud based on the counting of MDU residents as subscribers. *Coates II,* 55 F.Supp.2d at 636. According to plaintiffs' first amended complaint, it was Heartland company policy to count MDU residents as subscribers. Plaintiffs did not allege, however, that Heartland or any individual defendant had adopted the policy with intent to defraud. Therefore, even if a defendant was aware that company policy was being followed, this was not circumstantial evidence of fraud, but was simply indicative of adherence to company policy. The court reasoned that because mismanagement is alone insufficient to support a strong inference of fraud, plaintiffs were obligated to plead that defendants adopted the policy with conscious awareness that it was false or misleading. *Id.* The court held that plaintiffs had failed to plead specifically that it was fraudulent or misleading in the wireless cable or any similar industry to count as subscribers people who resided in an MDU that had itself contracted for wireless service to be provided exclusively to the entire unit by one company. *Id.* And even if the policy violated industry standards, such violations would alone be insufficient without corresponding fraudulent intent. *Id.* The court concluded that the MDU allegations failed

to raise a strong inference of fraud because plaintiffs had not identified any specific instances where MDU subscribers were improperly counted. *Id.*

Although plaintiffs have elaborated on their MDU allegations, principally by adding new ¶¶ 12(a) and 12(b) to their amended complaint, they have still failed to allege specific facts that establish that defendants adopted the MDU counting policy with intent to defraud or with conscious awareness that the policy was false or misleading. The assertions in their amended complaint that relate to defendants' knowledge that the counting policy misstated the actual number of MDU subscribers, *see* Am.Compl. ¶¶ 12(a), 12(b), 13, 14, and 15, do not pertain to what defendants knew when they adopted the counting policy. Conduct undertaken according to company policy does not alone give rise to a strong inference of fraud because it can be indicative of nothing more than adherence to a misguided, but not fraudulent, management decision. *See Acito,* 47 F.3d at 53 (noting that allegations of corporate mismanagement are not actionable under Rule 10b–5).[6]

In fact, plaintiffs' assertion in ¶ 12(b) of their amended complaint that Heartland changed its methodology at the end of 1996, and that it "wrote off 26,300 subscribers at year end in connection with its change in methodology," undercuts a strong inference of fraud. It corroborates that the decision to count these persons as subscribers was undertaken according to company policy, and shows that once Heartland altered this methodology, it promptly wrote these persons off.

2

In its prior opinion, the court rejected plaintiffs' reliance on their MDU allegations to establish severe recklessness because they had failed to meet both required elements to demonstrate scienter. *Coates II,* 55 F.Supp.2d at 641. The court applied the relevant severe recklessness standards to its analysis of plaintiffs' conscious behavior allegations and concluded that plaintiffs had also neglected to plead scienter under this standard. In particular, it concluded that plaintiffs had not alleged specific facts that showed that defendants were severely reckless in following, or in concealing that they were following, Heartland's policy concerning how MDU residents would be counted. The court also held that plaintiffs had not alleged that defendants had full knowledge that it was dangerous to adopt the MDU counting policy. *Id.*

In their amended complaint, plaintiffs have modified ¶ 13 and now allege that the individual defendants knew and understood that not disclosing information such as the MDU counting policy would mislead buyers of Heartland stock, or created a danger of misleading stock purchasers that involved an extreme departure from the standards of ordinary care. *See* Am. Compl. ¶ 13. This assertion is framed in conclusory terms and is therefore inadequate to support a strong inference of fraud. *See Comshare,* 183 F.3d at 553 (holding that securities fraud claims cannot rest on speculation and conclusory allegations); *Melder,* 27 F.3d at 1103–04; *Tuchman,* 14 F.3d at 1067. Nor have plaintiffs alleged specific facts that show what was the relevant industry standard of ordinary care for counting MDU subscribers.[7]

6. Nor have plaintiffs pleaded specifically that it was fraudulent or misleading in the wireless cable or a similar industry to count as subscribers people who reside in an MDU that has itself contracted for wireless service to be provided exclusively to the entire unit by one company. Although they assert that defendants "each understood that such information undermined the Company's reported subscriber count," Am.Compl. ¶ 13, and contend that this allegation is sufficient to plead severe

recklessness, *see* Ps.Br. at 13–14, the court deems this assertion inadequate under the reasoning followed in *Coates II* and in the present decision because it does not overcome the premise that Heartland followed industry practice.

7. Plaintiffs' reliance, if any, on GAAP is insufficient because none of the provisions they cite relates specifically to this issue.

Without such detail, they have not adequately pleaded specific facts that establish that defendants' conduct amounted to an extreme departure from that standard.

### C

### 1

■ The court held in *Coates II* that plaintiffs had not adequately asserted that defendants had engaged in conscious behavior by concealing the need to write off 20,700 soft disconnect customers (customers whose service had been cut off but whose equipment had not yet been retrieved). *Coates II*, 55 F.Supp.2d at 637. The court cited a March 20, 1997 Heartland press release—the content of which plaintiffs did not challenge—that stated that soft disconnect customers were common in the industry, and pointed out that plaintiffs had not pleaded specifically how the individual defendants had acted fraudulently by counting such customers in a manner common to the industry. *Id.*

In their amended complaint, plaintiffs have added ¶ 45(a), in which they allege that although Heartland represented in the press release that soft disconnects were common in the industry, "the counting of soft disconnects as 'active' subscribers is not, and to so count them was materially misleading." Am.Compl. ¶ 45(a). Plaintiffs offer no facts to support their conclusory assertion that it was not cus-tomary in the industry to count soft disconnects as active subscribers. This allegation is insufficient as a matter of law to plead scienter. *See Lovelace*, 78 F.3d at 1020 (holding that bare allegations about industry custom are inadequate to plead scienter). Nor do they address the other defects that the court identified in *Coates II*.

### 2

■ The court concluded that plaintiffs had failed to meet both required elements for pleading severe recklessness based on the counting of soft disconnects. *Coates II*, 55 F.Supp.2d at 641. The court applied the relevant severe recklessness standards to its analysis of plaintiffs' conscious behavior allegations and concluded that plaintiffs had also failed to plead severe recklessness. In particular, it held that plaintiffs had failed to allege specific facts that showed that it was severely reckless to count, or to conceal that Heartland was counting, soft disconnect customers that were common in the industry. *Id.* The court also concluded that plaintiffs had not alleged that defendants had full knowledge that it was dangerous to follow the industry custom concerning the counting of soft disconnects. *Id.*[8]

In opposition to defendants' motion to dismiss, plaintiffs cite ¶ 14(a), a new paragraph, to argue that they have adequately pleaded severe recklessness. *See* Ps.Br. at 12.[9] This paragraph is conclusory and

---

8. In their response to defendants' motion to dismiss, plaintiffs maintain that whether other wireless cable companies counted disconnected customers is a red herring. Ps.Br. at 2–3. They assert that if other companies in the industry engaged in such a practice, the deception perpetrated on investors would not be lessened. The salient point, however, is that such uniform conduct in an entire industry would dispel a strong inference of intent to defraud by one member of that industry.

9. Paragraph 14(a):
[Heartland] and the Defendants kept these material facts from the investing public despite their knowledge that to do so would mislead buyers of their securities regarding the number of subscribers Heartland really had and the strength and collectibility of the accounts receivable the Company carried on its books, and would portray [Heartland] in a false light with respect to its actual growth and prospects and the value of the Company's assets and its financial condition. At the very least, [Heartland] and the defendants knew that not disclosing the aforementioned material facts would create a danger of misleading buyers of [Heartland] securities and would involve an extreme departure from prudent revenue recognition in violation of GAAP (*see*, ¶¶ 15(a)–15(m)) and from the duty to speak the whole truth after having chosen to speak on the subject, especially considering their superior knowledge on the subject.

does not contain the specific facts that the court in *Coates II* held were required. Moreover, plaintiffs do not plead specific facts that show that it was severely reckless to count, or to conceal that Heartland was counting, soft disconnect customers that were common in the industry, or that demonstrate that defendants had full knowledge that it was dangerous to follow such an industry custom.

Plaintiffs also cite in their response brief ¶¶ 9(a), 9(c), 12, and 13 of their amended complaint to plead severe recklessness. Ps.Br. at 12–13. To the extent they rely on these paragraphs, the court finds them in part inadequate because they refer generally to what "management," "Defendants," the "Individual Defendants," or "they" knew or did. The court holds that the passages are in part insufficient because they do not contain specific facts that show that it was severely reckless to count, or to conceal that Heartland was counting, soft disconnect customers that were common in the industry, or that defendants had full knowledge that it was dangerous to follow such an industry custom. Nor, as with plaintiffs' MDU allegations, do these paragraphs allege specific facts that show what was the relevant standard of ordinary care for counting soft disconnects. Lacking such specificity, the amended complaint does not permit a finding that defendants engaged in activities that amounted to an extreme departure from that standard.

## D

### 1

■ In *Coates II* the court addressed plaintiffs' attempt to plead a strong inference of fraud based on 12,300 unrecoverable subscribers. Because the basis for

plaintiffs' assertion that these subscribers were unrecoverable was the age of the receivables,[10] the court held that the predicate for this claim was flawed in two respects. First, plaintiffs did not plead how many of the subscribers were overdue in their bills (and by how long) as of November 14, 1996. Second, and more significant, plaintiffs failed to provide "a satisfactory premise for the contention that 60-day–old receivables were uncollectible." *Coates II*, 55 F.Supp.2d at 638.

Although plaintiffs have added a paragraph in which they extrapolate from a February 1997 Flash Report and allege the amount and age of the receivables, *see* Am.Compl. ¶ 11(a), and perhaps implicitly assert that all 12,300 subscribers were overdue as of November 14, 1996, they have not specifically pleaded the age of these receivables.

More significantly, plaintiffs have still failed to assert more than a conclusory basis for contending that accounts 60 days or more past due would in all reasonable probability not be paid. Rather than allege, as they did in their first amended complaint, that defendants had "direct knowledge that customers in the wireless cable market who were 60 or more days past due would in all reasonable probability never pay and that collection efforts were not economically feasible, manageable or even being considered by management," *Coates II*, 55 F.Supp.2d at 638, they now advance the conclusory assertion that "[Heartland] and the Defendants knew the Company's collection history and the fact that Heartland typically did not collect customer accounts that were 60 days or more days past due." Am.Compl. ¶ 14. Their new basis for alleging uncollectibility is similarly flawed because it is conclusory.[11]

---

10. That this is the premise for plaintiffs' assertion is corroborated by a new paragraph in their amended complaint. *See* Am.Compl. ¶ 11(b) (alleging that Heartland "had an additional 12,300 subscribers with seriously past due balances who were slated to be disconnected.").

11. It is also inconsistent with plaintiffs' supposition that when Heartland wrote off $1 million in receivables, the bulk of them were likely 120 days or more overdue. *See id.* ¶ 11(a) n. 6. This would support the inference that Heartland deemed receivables uncollectible when they were 120 days or more over-

In their response to defendants' motion to dismiss, plaintiffs contend that defendants had actual and direct knowledge of Heartland's collection history and overstated receivables no later than February 7, 1997 by virtue of the Flash Report. *See* Ps.Br. at 5–6. They also maintain that it is reasonable to infer that defendants received reports like this prior to February 7, 1997. None of the parts of the amended complaint that they cite, however, plead specific facts that, assumed to be true, establish that defendants knew that receivables over 60 days past due were *uncollectible*. *See infra* § III(E)(2) (addressing distinction between management discussions of receivables and of *uncollectible* receivables).

2

■■■■ The court held in *Coates II* that plaintiffs' attempt to plead severe recklessness was insufficient because they had failed to allege specific facts that showed that it was severely reckless not to treat, or to conceal that Heartland was not treating, as uncollectible a group of subscribers who were 60 days or more past due in paying their bills. *Coates II*, 55 F.Supp.2d at 641. Plaintiffs rely in their opposition response on the same reasoning and parts of their amended complaint that they urge regarding the soft disconnect issue. *See* Ps.Br. at 12–13.

Paragraph 14(a) is insufficient because it is conclusory in this context as well. So far as they rely on ¶¶ 9(a), 9(c), 12, and 13 of their amended complaint to contend that defendants discussed the danger of misleading investors with respect to subscriber count and accounts receivable, *see id.*, these paragraphs are inadequate because they refer generally to what "management," "Defendants," the "Individual Defendants," or "they" knew or did, and do not contain specific facts that show that

defendants had full knowledge of the dangers of their course of action and chose not to disclose it. The allegation of ¶ 9(a) that "the very danger of misleading investors and the consequences thereof, was discussed by management during the same time period" is unquestionably conclusory. Plaintiffs' assertion in ¶ 12 that defendant Lane voiced concern during the February 7, 1997 Board of Directors meeting regarding the age and amount of Heartland's receivables is not a specific assertion that receivables over 60 days old were deemed uncollectible. Their new allegation in footnote 7 of ¶ 12 that "[t]he Board also discussed the aged receivables and *whether* they were collectible," Am.Compl. ¶ 12 n. 7 (emphasis added), is likewise inadequate to establish that defendants had concluded that they *were* uncollectible and, with full knowledge, chose not to disclose this fact.[12]

E

The court considers next whether plaintiffs have pleaded scienter based on the allegation that defendants misrepresented Heartland's accounts receivable. Plaintiffs rest this theory of scienter on assertions that Heartland reported accounts receivable that included sums owed by subscribers who were materially past due on their bills or who had already had their service disconnected.

1

The court held in *Coates II* that plaintiffs had failed to plead scienter under a conscious behavior standard based on the alleged overstatement of accounts receivable because they had not pleaded specific facts that established the materiality of the receivables, *Coates II*, 55 F.Supp.2d at 639–40, and, alternatively, because they were arguably alleging a claim based on Heartland's business judgment concerning

---

due rather than when 60 days or more in arrears.

12. Moreover, internal Heartland discussions concerning the need for a writedown that preceded the public announcement "are not

actionable as fraud, unless those discussions moved from the consideration and projection phase into an actual write-down phase." *Kriendler v. Chemical Waste Management, Inc.*, 877 F.Supp. 1140, 1153 (N.D.Ill.1995).

when collectibility became doubtful, *id.* at 640. It rejected plaintiffs' reliance on severe recklessness because plaintiffs had not alleged the specific facts necessary to establish that it was severely reckless to conceal a need to write down the receivables associated with the subscribers in question (*i.e.,* MDUs, soft disconnects, and "unrecoverable" subscribers), or to conceal the need to write down a sum of money not shown to be material to Heartland's total financial picture. *Id.* at 641. Plaintiffs maintain that they have adequately addressed all the defects identified in *Coates II.* The court will consider in tandem whether plaintiffs have adequately pleaded conscious behavior or severe recklessness.

### 2

■ Assuming *arguendo* that plaintiffs have in their amended complaint pleaded specific facts that support the allegation that a $5.2 million writedown was material, their receivables-based scienter allegations still fail to give rise to a strong inference of scienter. The gravamen of plaintiffs' theory that defendants acted with intent to defraud in misrepresenting Heartland's receivables is that Heartland reported accounts receivable and assets that included uncollectible receivables that were 60 or more days overdue and receivables from customers whose service had been disconnected. This assumption is not supported by specific facts that permit a strong inference that receivables of this type were uncollectible and that defendants acted with scienter in misrepresenting Heartland's financial condition. The court has already explained why the 60–day assertion is unsupported in the context of reported subscribers. Plaintiffs have not otherwise averred specific facts that establish that Heartland knew it could not collect from customers who were in arrears or whose service had been disconnected.

In their response brief, plaintiffs contend they have "allege[d] that the defendants had actual and direct knowledge of Heartland's collection history and experi-ence." Ps.Br. at 5. The court disagrees. Most of the cited documents do not refer to Heartland's history or experience—successful or not—*collecting* receivables. The reports concern the *age* of the receivables. It is one thing for management to discuss the age of unpaid bills (*e.g.,* to question why the company collections department was not doing a better job); it is another matter to deem overdue bills uncollectible (*e.g.,* to conclude that receivables over a certain age must be written off). Because discussions of aged receivables could in fact focus on some aspect other than their collectibility, this evidence does not raise a strong inference of scienter. Plaintiffs' allegation that the Board of Directors discussed during a February 7, 1997 meeting "the aged receivables and *whether* they were collectible," Am.Compl. ¶ 12 n. 7 (emphasis added), does not plead specific facts that establish. that defendants knew the receivables were *uncollectible.*

The securities laws do not entitle plaintiffs to bring claims based on fraud by hindsight. *See, e.g., Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Stevelman v. Alias Research Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (quoting *Acito,* 47 F.3d at 53). Plaintiffs must therefore do more than merely question the timing of a writeoff. *See DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) ("If all that is involved is a dispute about the timing of the writeoff, ... we do not have fraud; we may not even have negligence."). "Timing, alone, cannot support an inference of fraud." *Kriendler v. Chemical Waste Management, Inc.,* 877 F.Supp. 1140, 1154 (N.D.Ill.1995). Instead, "[t]he standard is whether the need to write-down ... was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud." *Id.* Plaintiffs have failed to plead the facts necessary to establish that the need for the writedown was so apparent that the

fact that it was not taken gives rise to a strong inference of fraud.

## F

■ Either as a basis for establishing the standard of ordinary care, and thus defendants' severe recklessness in overstating and concealing the need to write down Heartland's subscriber count and/or accounts receivable, or as an independent basis for pleading scienter based on conscious behavior and/or severe recklessness, plaintiffs have added ¶¶ 15(a)–15(m) to their amended complaint and allege that defendants violated GAAP and, in turn, SEC Regulation S–X, in various respects.

■ "The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *Comshare*, 183 F.3d at 553; *see also Stevelman*, 174 F.3d at 84 ("[Pleading only GAAP violations] may not, in itself, be sufficient: 'Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim.'" (quoting *Chill*, 101 F.3d at 270)). "[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter. The party must know that it is publishing materially false information, or the party must be severely reckless in publishing such information." *Fine v. American Solar King Corp.*, 919 F.2d 290, 297 (5th Cir.1990). GAAP violations "may give rise to an inference of fraudulent intent only when coupled with specific and properly pled allegations of fraud." *In re Ultrafem Inc. Sec. Litig.*, 91 F.Supp.2d 678, 703–04 (S.D.N.Y.2000) (emphasis deleted) (quoting *Novak v. Kasaks*, 26 F.Supp.2d 658, 663 (S.D.N.Y.1998)).

Plaintiffs allege that Heartland violated GAAP in two principal respects: by improperly recognizing revenue and by failing adequately to reserve for uncollectible receivables. "The term 'generally accepted accounting principles' ... is a term of art encompassing a wide range of acceptable procedures, such that 'an ethical, reasonably diligent accountant may choose to apply any of a variety of acceptable accounting procedures when that accountant prepares a financial statement.'" *Lovelace*, 78 F.3d at 1020 (quoting *Godchaux v. Conveying Techniques, Inc.*, 846 F.2d 306, 315 (5th Cir.1988)). Therefore, to remove the accounting practices that plaintiffs challenge from the realm of acceptable choices, plaintiffs must specifically and properly plead fraud.

Their allegations of fraudulent intent are substantially the ones the court has already rejected and are otherwise inadequate. Plaintiffs' assertions regarding improper revenue recognition are all derived from contentions the court has already found inadequate to plead scienter. Under the rubric of failure adequately to reserve for uncollectible receivables, plaintiffs add the new allegation in their amended complaint that "[m]uch of the bad debt write-off at December 31, 1996 was *apparently* attributed to acquisition markets, in particular the Austin market." Am.Compl. ¶ 15(h) (emphasis added). They also assert that Heartland "had millions of dollars worth of systems equipment at the premises of customers who had stopped paying for [Heartland's] services." *Id.* ¶ 15(j). Obviously, plaintiffs' reliance upon what "apparently" occurred at December 31, 1996 is speculative and thus inadequate. *See Phillips*, 190 F.3d at 623 (holding that court may not accept claims of fraud based on speculation). Their assertion that Heartland had millions of dollars in unused systems equipment fails because it assumes that soft disconnects and 60–day old receivables should have been treated as uncollectible.

Accordingly, plaintiffs have not adequately pleaded scienter based on conscious behavior or severe recklessness with respect to Heartland's noncompliance with GAAP.

## III

The court next considers whether plaintiffs have adequately pleaded scienter

based on motive and opportunity to commit securities fraud.

## A

The circuit courts are split concerning whether the PSLRA allows plaintiffs to plead scienter based on motive and opportunity. The Second and Third Circuits hold that it does. *See Press v. Chemical Inv. Servs. Corp.,* 166 F.3d 529, 537–38 (2d Cir.1999); *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534–35 (3d Cir.1999). The First, Sixth, Ninth, and Eleventh Circuits have adopted the rule that motive and opportunity allegations are not alone sufficient to plead a strong inference of scienter. *See Greebel,* 194 F.3d at 197; *Comshare,* 183 F.3d at 549; *Silicon Graphics,* 183 F.3d at 974; *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1285–86 (11th Cir. 1999).[13] Before the PSLRA was enacted, the Fifth Circuit permitted scienter to be pleaded on this basis. *See Tuchman,* 14 F.3d at 1068. The circuit court has not decided whether the PSLRA has eliminated motive, but the First Circuit has interpreted *dicta* in *Williams v. WMX Technologies., Inc.,* 112 F.3d 175, 178 (5th Cir. 1997), to hold that motive and opportunity remains sufficient. *See Greebel,* 194 F.3d at 197. Several district courts within this circuit, including this court in *Coates II,* have held that motive and opportunity survived enactment of the PSLRA. *But see In re Paracelsus Corp. Sec. Litig.,* 61 F.Supp.2d 591, 597 (S.D.Tex.1998) (rejecting motive and opportunity as insufficient to raise strong inference of fraud).

## B

As in their previous complaint, plaintiffs assert that defendants were motivated to commit fraud to enable Heartland to market itself to a third-party as a lucrative acquisition candidate and in the process enrich themselves, and to permit Heartland to acquire new systems and companies using its stock. The pertinent allegations in the amended complaint are virtually unchanged from the first amended complaint. The court adheres to the reasoning of *Coates I* and *II* and rejects these grounds for pleading motive. *See Coates I,* 26 F.Supp.2d at 919; *Coates II,* 55 F.Supp.2d at 642–45.[14]

## C

Plaintiffs also allege, as before, that defendants were motivated to commit securities fraud to ensure the success of a $125 million note offering in December 1996. They have added ¶¶ 17(a)–17(e) and ¶ 18 to their amended complaint to assert scienter on this basis.

"To plead motive, a plaintiff must aver with particularity the concrete benefits that could be recognized by a statement or omission." *Coates II,* 55 F.Supp.2d at 642 (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994)).[15] A generalized motive that "could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter."

**13.** In *Bryant* the Eleventh Circuit characterized the Sixth Circuit's view in *Comshare,* with which it was in basic agreement, as a "middle course." *Bryant,* 187 F.3d at 1283.

**14.** In their response to defendants' motion, plaintiffs contend the court failed to consider the value of Heartland's licensing agreements and pending FCC license applications when it rejected their acquisition candidate claim. Ps.Br. at 19. The court disagrees. The premise for the court's reasoning in *Coates II* was that it was illogical to allege that defendants would attempt to defraud the entire market when the one party who mattered—the potential purchaser—would quickly discover the truth "once it began testing the accuracy of Heartland's subscriber base and accounts receivable." *Coates II,* 55 F.Supp.2d at 643–44. Regardless whether Heartland had valuable licensing agreements and applications, a potential buyer of the sophistication in question would perform due diligence concerning the company's financial state of affairs.

**15.** "To plead opportunity, a plaintiff must allege specific facts that set out the means and likely prospect of achieving concrete benefits by the means alleged." *Coates II,* 55 F.Supp.2d at 642.

*Chill,* 101 F.3d at 268. "[A]ssertions that would almost universally be true, such as the desire to raise capital, or successfully to bring a public offering to fruition … are inadequate of themselves to plead motive." *Coates II,* 55 F.Supp.2d at 644 (citations omitted).

■ To plead a *strong inference* of fraud with respect to the December 1996 $125 million note offering, plaintiffs must allege with particularity facts that, assumed to be true, constitute persuasive, effective, and cogent evidence from which it can be logically deduced that defendants acted with intent to deceive, manipulate, or defraud. They have not done so here.

Plaintiffs seek to remove their case from a garden-variety raising capital animus to an intention to defraud by alleging that Heartland could not have obtained needed approval for the note offering absent consent from current debt holders. *See* Am. Compl. ¶ 17(c). Plaintiffs aver that "it is reasonable to infer that the existing debt holders would not have consented if they had known [Heartland]'s reported [earnings] for the 3rd Quarter of 1996 was not really the best it had ever been before ($1.3 million) but was in fact negative." *Id.* This conclusory allegation is purely speculative, which is insufficient to plead a strong inference of scienter. *See Phillips,* 190 F.3d at 623. Plaintiffs do not allege facts to support the assertion that existing debt holders would have withheld their consent. In fact, their amended complaint indicates that debt holders considered other factors in deciding to acquiesce, such as receipt of $6.9 million in consent solicitation fees. *See* Am.Compl. ¶ 17(e) ("In fact, [Heartland] paid '$6.9 million in consent solicitation fees to the holders of the [existing notes]' to persuade said holders to consent to the issuance of $125 million in more debt.").

The court therefore holds that they have failed to plead a strong inference of fraud on this basis.

D

■ Plaintiffs assert in response to defendants' motion that they have alleged motive based on the fact that defendant Sprague and his company, Jupiter Partners L.P. ("Jupiter"), had $40 million in notes that were convertible into Heartland stock at a per share price of $15.34, and that Jupiter and Sprague stood to make much money if the price of Heartland stock moved above that price. Ps.Br. at 20. This allegation, and the part of the amended complaint on which it is based, are insufficient to give rise to a *strong inference* of fraud. Addressing only the terse contention set forth in the response brief, it is unclear why, if Jupiter and Sprague were motivated to commit fraud, Jupiter did not exercise its conversion rights during the third quarter of 1996, at a time when plaintiffs allege the stock was trading higher than the strike price and when defendants allegedly already knew Heartland's true financial condition and the impact that disclosure would have on the company and the price of its stock. Plaintiffs have failed to plead a strong inference of fraudulent intent on this basis. *See Phillips,* 190 F.3d at 623–24 (holding that court was "unwilling to piece together speculative inferences to conclude that [the defendant] had a true motive to commit fraud" where, under plaintiffs' theory, defendant would have acted irrationally by depressing stock price, and concluding that plaintiffs had failed under PSLRA to plead strong inference of fraudulent intent).

V

Because the court holds that plaintiffs' § 10(b) and Rule 10(b)–5 claims fail, their control person liability claim is likewise dismissed. *Coates II,* 55 F.Supp.2d at 645.

\*　　\*　　\*　　\*　　\*　　\*

The court grants defendants' motion to dismiss and dismisses with prejudice the claims against the individual defendants by Rule 54(b) final judgment filed today.[16]

**SO ORDERED.**

16. Plaintiffs' claims against Heartland remain. Because the court has administratively closed this case as to Heartland, the clerk of court shall consider the remainder of this case to be closed statistically.