In re NETSOLVE, INC. SECURITIES
LITIGATION.

No. A 00 CA 591 SS.

United States District Court,
W.D. Texas,
Austin Division.

Aug. 15, 2001.

James D. Baskin, III, Baskin, Bennett & Komkov L.L.P., Austin, TX, Steven G. Schulman, Samuel H. Rudman, Richard Weiss, Milberg, Weiss, Bershad, New York City, for Peter Wilson.

James D. Baskin, III, Baskin, Bennett & Komkov L.L.P., Austin, TX, Andrew L. Barroway, Marc A. Topaz, Stuart L. Berman, Shiffrin & Barroway, Bal Cynwyd,

PA, Steven G. Schulman, Samuel H. Rudman, Richard Weiss, Milberg, Weiss, Bershad, New York City, for HLM Management Co., Donald Douglas, Sr.

Thomas E. Bilek, Hoeffner, Bilek & Eidman, L.L.P., Houston, TX, Fred Taylor Isquith, Gregory Mark Nespole, Wolf, Haldenstein, Adler, Freeman & Herz L.L.P., New York City, Charles J. Piven, Law Offices of Charles J. Piven, P.A., Baltimore, MD, for John Stassi.

James D. Baskin, III, Baskin, Bennett & Komkov L.L.P., Austin, TX, Stuart L. Berman, Shiffrin & Barroway, Bal Cynwyd, PA, for John P. Palen, Carilyn Palen.

Thomas E. Bilek, Hoeffner, Bilek & Eidman, L.L.P., Houston, TX, for Robert Aberger.

James D. Baskin, III, Baskin, Bennett & Komkov L.L.P., Austin, TX, Leo W. Desmond, Law Office of Leo W. Desmond, West Palm Beach, FL, for Tom Sullivan, Joseph G. Mason.

Patton G. Lochridge, McGinnis, Lochridge & Kilgore, Austin, TX, Gregory L. Watts, Michael David Celio, Leo P. Cunningham, Stuart Kagen, Bruce G. Vanyo, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, for NetSolve, Inc., Craig Tysdal, Harry S. Budow, Kenneth C. Kiely, Robert C. Pojman.

## ORDER

SPARKS, District Judge.

BE IT REMEMBERED that on the 15th day of August 2001 the Court reviewed the file in the above-styled cause and specifically NetSolve, Inc.'s Motion to Dismiss [# 20], the plaintiffs' opposition thereto [# 21] and NetSolve's reply thereto [# 24]; and the Individual Defendants' Motion to Dismiss [# 19], the plaintiffs' opposition thereto [# 22] and the individual defendants' reply thereto [# 23]. After considering the motions, opposition and reply briefs, the case file as a whole and the applicable law, the Court enters the following opinion and order.

This is a federal securities fraud case, filed as a class action on behalf of all persons who bought common stock in NetSolve, Inc. between April 18, 2000 and August 18, 2000 ("class period"). The claims are brought against NetSolve and four of its officers and directors ("individual defendants"): Craig S. Tysdal (President and CEO), Kenneth C. Kieley (Vice President of Finance, CFO and Secretary), Robert C. Pojman (Vice President of Operations) and Harry S. Budow (Vice President of Marketing). See Consolidated Amended Complaint [# 18] ("Complaint") ¶¶ 1 and 8–9. While the complaint is not a model of coherency, the gist appears to be that, during the class period, the defendants knew but failed to publicly disclose the following: (1) since January 2000, sales to NetSolve's primary customer, AT & T, had been declining; (2) since April 2000, NetSolve had been losing a "significant" number of other customers due to service problems; (3) a high turnover in NetSolve's sales force had caused it to lose "additional" sales and revenue from existing customers; and (4) NetSolve's switch to larger contracts would reduce short-term revenue. The plaintiffs claim that, by keeping this information from the market, the individual defendants were able to sell more than 110,000 shares of their NetSolve stock at artificially inflated prices.

### Factual Background

NetSolve's business focuses on computer networks. In general, NetSolve designs, installs, manages and maintains various computer network services. See Complaint, at ¶ 17. Since 1997, NetSolve's primary customer has been AT & T. See id. ¶ 20. AT & T is a "reseller" customer— that is, it buys network services from Net-

Solve, includes them in its overall network package, and then resells the services as part of an AT & T-branded product. For fiscal year 2000, AT & T accounted for approximately 70% of NetSolve's total revenue. *See id.* NetSolve also sells network services to other "resellers," as well as directly to "end-user" customers (*i.e.*, customers who use the network services in their own systems, rather than packaging and reselling them). *See id.* ¶¶ 19–20.

In September 1999, NetSolve became a publicly-traded company. Its stock was initially offered at $13 per share, and the price rose significantly in the following months. *See id.* ¶ 21. Because of securities regulations, however, the individual defendants could not sell their personal NetSolve shares until their "lock-up" period ended on March 31, 2000. *See id.* ¶ 24.

In January 2000, the defendants allegedly "knew or recklessly disregarded" that NetSolve's sales to AT & T had begun to decline. *See id.* ¶ 37. The plaintiffs base this allegation on information acquired from a former NetSolve consultant who "served on customer related technical projects as an engineering manager." *See id.* ¶ 29. The plaintiffs allege the individual defendants knew of this problem because of the "sales cycle" to AT & T, and because the individual defendants occupied the key positions of "control and authority" at NetSolve and "constantly monitored" NetSolve's business activity with AT & T. *See id.* ¶¶ 14, 37 and 71–72.

On March 31, 2000, the individual defendants' "lock-up" period ended, and they were able to sell their personal NetSolve stock. Although NetSolve's stock had peaked around $58 per share in mid-March, by March 31, 2000 it had dropped to about $34 per share. *See id.* ¶¶ 21–24.

In April 2000, the defendants allegedly knew AT & T's "installations" of NetSolve's services "had slowed significantly."

*See id.* ¶ 37; *see also id.* ¶ 35 (by April 2000 NetSolve was experiencing a "reduction in AT & T sales"). The plaintiffs base this allegation on information from the same NetSolve consultant discussed above. *See id.*

Also in April 2000, NetSolve allegedly was experiencing "customer losses related to service problems." *See id.* ¶ 35. According to the plaintiffs, customer service complaints became frequent enough that "members of Operations management [at NetSolve] spent most of their day fielding and responding to such [complaints]." *See id.* ¶ 29. The plaintiffs allege these "service problems ... cost the Company both existing and potential new customers." *See id.* ¶¶ 30–31; *see also id.* ¶ 34 ("NetSolve lost many customers because of its inability to meet the basic operational requirements of the customers' networks.") and ¶ 54 ("[T]he Company was losing a significant number of its customers due to poor service."). According to the plaintiffs, sometime in April 2000, "a potential reseller partnership with BellSouth fell through at least in part because of service problems." *See id.* ¶ 35. Similarly, the plaintiffs contend that, in April 2000, NetSolve lost BT Office Supplies as a customer, and lost a potential contract with another company that had acquired BT, both because of service problems. *See id.* ¶ 31. The plaintiffs further contend that, at this time, NetSolve internally released the results of a customer satisfaction survey "indicating that customers had lost confidence in NetSolve." *See id.* ¶ 39. The plaintiffs claim the individual defendants were aware of the customer service problem by April 2000, because of their key positions at NetSolve and because defendants Tysdal, Pojman and Budow were made "personally aware" of the problem by other NetSolve employees. *See id.* ¶¶ 15, 71 and 73–74. The plaintiffs base these allega-

tions on information acquired from two former NetSolve consultants who handled customer complaints, from a former manager of NetSolve's network management center, and from a former NetSolve security engineer. *See id.* ¶¶ 28, 29 and 32–33.

On April 18, 2000—the day the class period began—NetSolve issued a press release discussing its financial results for the quarterly and yearly periods ending March 31, 2000.[1] *See* NetSolve's Motion to Dismiss, Ex. B, Tab 6. The release listed defendants Tysdal, Kieley and Budow as contacts. It stated that as of March 31, 2000, NetSolve's network management revenues (its primary business area) had increased 88% over the previous year. It also contained a statement from Tysdal that "[a]dditionally, we continue to see strong growth from our network integrator and value added reseller partners."[2] The release did not mention that NetSolve's AT & T sales allegedly had been declining since January 2000.

The next day, April 19, 2000, NetSolve held an analyst conference call to discuss the March 31, 2000 financial data. *See* NetSolve's Motion to Dismiss, Ex. B, Tab 8. Defendant Budow began the call with the standard "forward-looking statements" disclaimer. Tysdal then stated the March 31, 2000 data showed "a 42 percent income growth over this year. So the business is very healthy. It is a business that is predictable. It is a business that is proven." Tysdal also told the analysts that NetSolve had begun a shift toward larger customers: "[T]he mix shifted in our products to more higher end services to larger customers, so even though the [number of] sites went down the recurring revenues and the network management revenues in

total actually increased." Tysdal also stated that, for the quarter ending March 31, 2000, "AT & T posted its strongest quarter with us." Finally, Tysdal represented that, as of March 31, 2000, "[t]he business is starting to accelerate and all of our channels are hitting on all cylinders." Tysdal did not mention that NetSolve's sales to AT & T allegedly had been declining since January 2000.

The following day, April 20, 2000, Pojman and Kieley each sold 1,000 of their personal shares in NetSolve, at $30 a share. *See* Complaint, at ¶ 49. Over the next three weeks, defendants Tysdal, Pojman and Kieley sold over 54,000 of their personal shares of NetSolve stock, at prices ranging from $25 to $30 per share. *See id.*

On May 18, 2000, Budow gave a news interview to Reuters, during which he noted NetSolve had exceeded analysts' per-share earnings estimates by at least two cents every quarter, and represented "[t]here's no reason not to expect" that trend to continue. *See* NetSolve's Motion to Dismiss, Ex. B, Tab 13. Budow did not mention NetSolve's sales to AT & T allegedly had been declining since January 2000, or that since April 2000 NetSolve allegedly had been losing a "significant" number of other customers due to service problems.

From May 19, 2000 to May 31, 2000, Tysdal, Pojman and Kieley sold over 25,000 of their personal shares of NetSolve common stock, for approximately $26 per share. *See* Complaint, ¶ 52.

On May 23, 2000, NetSolve filed its 10–K form, discussing its financial data for the year ending March 31, 2000. *See* Net-

---

1. On April 17, 2000, the day before the class period began, NetSolve's stock closed at just above $24 per share. *See* Complaint, at ¶ 26.

2. It is not clear whether this was an analysis of the March 31, 2000 financial data, or a representation of NetSolve's future business with its "value added resellers," which included AT & T.

Solve's Motion to Dismiss, Ex. B, Tab 2. In the 10–K, NetSolve stated its customers could cancel their NetSolve contracts, and that "[c]ancellations due to reasons other than closings of managed locations, which to date [as of March 31, 2000] have not been material, are generally subject to cancellations fees." See id. at 19.[3] The 10–K form did not mention that NetSolve's sales to AT & T allegedly had been declining since January 2000.

On July 5, 2000, a third-party analyst issued a report discussing NetSolve. See Complaint, at ¶ 55. The plaintiffs contend the information in this report was provided by the individual defendants. According to the plaintiffs, the report stated NetSolve's percentage of "bookings" from AT & T would decrease by 6% in the June quarter, and NetSolve's percentage of "revenue" from AT & T also was declining, while the percentage of revenue from other resellers was growing.[4] The report did not state that NetSolve's sales to AT & T allegedly had been declining since January 2000. The report further stated that NetSolve's "pipeline is robust, suggesting positive future new business bookings and indicating a solid backlog." It did not mention that since April 2000 NetSolve allegedly had been losing a significant number of its non-AT & T customers due to service problems.

On July 18, 2000, NetSolve issued a press release discussing its financial results for the quarter ending June 30, 2000. See NetSolve's Motion to Dismiss, Ex. B, Tab 7. The release stated NetSolve's network management revenues for the quarter were 82% higher than the same quarter the previous year. The release also quoted Tysdal as stating "[t]his quarter's growth is due to continued steady growth in our WAN management services as well as increased traction in our LAN and Security offerings. And we continue to strengthen our sales efforts through our valued channel partners." The release did not mention NetSolve's sales to AT & T— its primary WAN services customer and its primary channel partner—allegedly had been declining since January 2000, or that NetSolve allegedly had been losing a significant number of its other customers due to service problems since April 2000.

On July 19, 2000, NetSolve held another conference call to discuss financial data for the quarter ending June 30, 2000. See NetSolve's Motion to Dismiss, Ex. B, Tab 9. The call began with the standard "forward-looking" disclaimer. Tysdal then stated NetSolve's "customer growth in the last quarter was a little bit below the average" but noted NetSolve was shifting to "larger customers." Tysdal did not

**3.** It is not clear whether NetSolve meant that as of March 31, 2000 its contract cancellations were immaterial, or that closings of managed locations were immaterial. In any event, according to the plaintiffs, NetSolve did not experience "significant" customer cancellations until April 2000.

**4.** The different references to NetSolve's business with AT & T require some clarification. In their motions, the defendants repeatedly state that NetSolve's revenue from AT & T increased before and during the class period, both in terms of absolute dollars and as a percentage of total revenue. This may be true, but it is not relevant. The plaintiffs are claiming the statements regarding sales to AT

& T constitute fraud. Specifically, the plaintiffs are alleging that, even if the amount of money NetSolve received from AT & T increased, sales to AT & T did not, and it was this sales decline that, when finally disclosed, caused NetSolve's stock price to drop. It is not clear, however, whether the plaintiffs claim the decline was in the absolute number of sales, or in the percentage of NetSolve's total sales. Giving the plaintiffs the benefit of the doubt, the Court will assume the former since, well before the class period ended, NetSolve allegedly disclosed that the percentage of its sales to AT & T (i.e., the proportion of "bookings" by AT & T) was decreasing. See id. and NetSolve's Motion to Dismiss, Ex. B, Tab 9.

state that since April 2000 NetSolve allegedly had been losing a significant number of its non-AT & T customers due to service problems. Tysdal later represented that NetSolve's business with AT & T "looks steady, but as a percent of booking it in fact declined work vis-a-vis their percent of recurring revenue." Tysdal cast this as a positive indication that NetSolve was diversifying its customer base: "So we believe that as we move forward the total, the concentration of AT & T as a total percent of our network management revenues and in particular our recurring revenues will decrease." Tysdal did not indicate NetSolve's sales to AT & T allegedly had been declining since January 2000. Later in the call, Kieley noted NetSolve was switching to larger customers, and providing these customers discounts for purchasing in bulk. Kieley stated that, as a result of this switch, "[t]otal revenues per site, on a single product basis could actually go down a little bit." On the same issue, Tysdal stated it was "a little bit hard to call" and "difficult for us to forecast" how the switch to larger customers would affect NetSolve's per-customer revenues.

On July 20, 2000, a third party analyst issued a report on NetSolve's financial results for the quarter ending June 30, 2000. *See* NetSolve's Motion to Dismiss, Ex. B, Tab 10. The report stated NetSolve's percentage of sales to AT & T had declined, and reflected Tysdal's statement that NetSolve therefore was reducing its dependence on AT & T: "As a percentage of bookings, AT & T concentration continued to fall (> − 5%), suggesting a downtrend in concentration." The report further noted NetSolve's "[t]rend toward larger customers."

From July 20, 2000 to August 7, 2000, Pojman and Budow sold over 27,000 of their personal shares in NetSolve, at prices ranging from $27 to $19 per share. *See* Complaint, at ¶ 66.

On August 14, 2000, NetSolve filed its 10–Q form, discussing the financial data for the quarter ending June 30, 2000. *See* NetSolve's Motion to Dismiss, Ex. B, Tab 3. The 10–Q form indicated that NetSolve's revenues from AT & T continued to increase, both in absolute numbers and as a percentage of NetSolve's overall revenue. The 10–Q did not mention that sales to AT & T allegedly had been declining since January 2000, or that NetSolve allegedly had been losing a significant number of its other customers due to service problems since April 2000.

According to the plaintiffs, at some point prior to August 18, 2000 (the plaintiffs do not specify when), the defendants knew a turnover in NetSolve's sales force had caused it to lose "additional sales" and "additional revenue" from its "existing" non-AT & T customers. *See* Complaint, at ¶¶ 36, 41, 46(b) and 62. The plaintiffs also claim at some unspecified point prior to August 18, 2000, the defendants knew the "implementation cycles were lengthening" for NetSolve's larger contracts. *See id.* ¶¶ 40–41, 46(d) and 80.

On August 18, 2000—the day the class period ended—the defendants allegedly held several conference calls with analysts, and stated that "due to declining sales to AT & T and lengthening implementation cycles [from the larger contracts], the Company's network management services revenue growth would slow appreciably from historic levels." *See* Complaint, at ¶ 68. The same day, an analyst issued a report "lowering [its] estimates on NetSolve to reflect slower than anticipated sales of the Company's low-end managed DSU service resold by AT & T, and slower installation cycles for the growing number of large customers." *See* NetSolve's Motion to Dismiss, Ex. B, Tab 11. The report elaborated that "[s]ince June, NetSolve has seen a meaningful decline" in its

AT & T sales, and NetSolve "is finding that larger contracts take 3–4x longer to rollout than smaller contracts; this was not anticipated." Also on August 18, 2000, another analyst issued a report lowering its estimates on NetSolve. *See* NetSolve's Motion to Dismiss, Ex. B, Tab 12. In this rather vague report, the analyst stated it was lowering NetSolve estimates because "changes in product and customer mix will reduce the company's revenue growth," and because the larger contracts "likely" would take longer to implement, thereby "likely reduc[ing] revenue growth rates in the near term." The report also concluded NetSolve needed to "decrease its reliance on AT & T." [5]

The plaintiffs contend that, "[a]s this information became public, the price of NetSolve common stock dropped precipitously." *See* Complaint, at ¶ 2. On the same day, August 18, 2000, NetSolve's stock price dropped some 38%, from $12.625 per share down to around $7.70 per share.[6]

### Motion to Dismiss Standard

On a motion to dismiss, the Court "will accept as true the well-pleaded factual allegations of the consolidated complaint and any reasonable inferences to be drawn from them." *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). However, the Court will "not accept as true conclusory allegations or unwarranted deductions of fact." *Id.*

To state a claim under § 10(b) and Rule 10–b5 of the federal securities laws, a plaintiff must allege: "1) a misstatement or omission; 2) of material fact; 3) made

with the intent to defraud; 4) on which the plaintiff relied; and 5) which proximately caused the plaintiff's injury." *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177 (5th Cir.1997), *cert. denied,* 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997). Because § 10(b) and Rule 10–b5 sound in fraud, the plaintiff's allegations must comply with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, *see Tuchman,* 14 F.3d at 1068, as well as the requirements of the 1995 Private Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u–4(b).

With respect to the circumstances of the fraud—the who, what, where, when and why—the PSLRA "adopted the same standard" of particularity required by the Fifth Circuit. *See Williams,* 112 F.3d at 177. In the Fifth Circuit, compliance with this standard "requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Id.*

In addition to pleading the circumstances of the fraud with particularity, the plaintiffs also must plead scienter. *See Tuchman,* 14 F.3d at 1068. Under pre-PSLRA Fifth Circuit law, an "inference" of scienter could be plead "by alleging facts that show a defendant's motive to commit securities fraud. Where a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant,

---

**5.** Curiously, this report stated "AT & T accounted for … 64% of total revenues in the quarter ended June 30, 2000" while the defendants contend AT & T accounted for 72% of total revenues for that same quarter. *See* Defendants' Statement of Facts, at 2. As noted, however, the plaintiffs are not basing their

fraud allegations on the reported percentage of AT & T revenue.

**6.** The plaintiffs first allege the closing price on August 18, 2000 was $7.625 per share, then later allege it was $7.75 per share. *Compare* Complaint, at ¶ 2 *with* Complaint, at ¶ 69.

though the strength of the circumstantial allegations must be correspondingly greater." *Id.* The PSLRA arguably has upped the scienter requirement a notch—the complaint must now plead "with particularity" a "strong inference" of scienter. *See* 15 U.S.C. § 78u–4(b)(2); *see also Coates v. Heartland Wireless Communications, Inc.,* 100 F.Supp.2d 417 (N.D.Tex.2000) (" '[I]nferences of scienter survive a motion to dismiss only if they are both reasonable and "strong" inferences.' ") (citation omitted). The Fifth Circuit has not addressed how the PSLRA effects the scienter pleading requirement. Its sister circuit, however, has held that merely pleading motive and ·opportunity—which was fine before the PSLRA—is not enough to meet the PSLRA's requirements.· *See Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1285 (11th Cir.1999) ("[W]e reject the notion that allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter in this Circuit."). Other circuits, however, have more recently held that motive and opportunity, standing alone, are enough to plead scienter under the PSLRA. *See Novak v. Kasaks,* 216 F.3d 300 (2nd Cir.2000), *cert. denied,* 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000).

### Analysis

### I. NetSolve's Motion to Dismiss

#### A. Allegation that Defendants' Statements Were Misleading

NetSolve first argues for dismissal on the ground that the plaintiffs do not "adequately" allege any statements made during the class period were misleading.

NetSolve's arguments, however, miss the point of the plaintiffs' allegations.

■ First, NetSolve contends the defendants' press release and conference call statements were not misleading because they "accurately reported financial results" from the previous quarters. *See* NetSolve's Motion to Dismiss, at 3; *see also* Individual Defendants' Motion to Dismiss, at 8–9. However, the plaintiffs are not challenging the accuracy of the financial data or the defendants' interpretation of this data.[7] What the plaintiffs are arguing is that, when reporting this data and making positive statements about its business with AT & T and customer growth, NetSolve failed to disclose four allegedly material problems relevant to this data—AT & T sales had been declining since January 2000, a significant number of other customers had been leaving since April 2000 because of poor service, a high turnover in the sales force was causing additional lost money, and NetSolve's new large contracts would delay short-term revenue. *See, e.g.,* Plaintiffs' Opposition [# 21], at 3. An omission may be misleading if it renders the reported information misleading. *See Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996); *Karacand v. Edwards,* 53 F.Supp.2d 1236, 1243–44 (D.Utah 1999). In its motion to dismiss, NetSolve does not address the plaintiffs' allegation that the press release and conference call statements were misleading because of what they *omitted.* This ground for dismissal is overruled.

■ Second, NetSolve contends Budow's May 18, 2000 statement—that there was "no reason" not to expect an earnings

---

7. To the extent the plaintiffs do challenge the press release and conference call statements on this ground, their claims wholly lack merit. The plaintiffs do not dispute the numbers themselves, and the defendants cannot be liable simply for their choice of adjectives in describing these numbers. *See Tuchman,* 14 F.3d at 1069. The defendants may be liable, however, if they omit material information that, because it is not disclosed, renders the numbers and positive statements misleading. *See Gross v. Summa Four, Inc.,* 93 F.3d 987, 992 (1st Cir.1996).

increase—was accurate because the earnings increase did in fact occur, for the quarter ending June 30, 2000. *See* NetSolve's Motion to Dismiss, at 4. NetSolve therefore contends any omitted information "obviously had no impact on [the] accuracy" of Budow's statement. *See id.* The flaw in this logic, however, is that the omitted information allegedly was not disclosed until *after* the June quarter, on August 18, 2000. Thus, it obviously would not have had an "impact on the accuracy" of Budow's statement with respect to the June quarter, because it had not yet been revealed. Indeed, that is the whole point of the plaintiffs' complaint—by delaying disclosure of this information and representing there was "no reason" to expect lower earnings per share, NetSolve's stock price was artificially inflated for the June quarter. According to the plaintiffs' theory, once the omitted information *was* disclosed, in mid-August, this caused NetSolve's stock price to drop significantly. The defendants' motion to dismiss on this ground also is overruled.

■ Third, NetSolve turns to the following statement in its 10–K form, for the year ending March 31, 2000: "Cancellations due to reasons other than closings of managed locations, which to date have not been material, are generally subject to cancellations fees." NetSolve argues this statement was not misleading because the phrase "have not been material" was used to describe the closings of third-party managed locations, not the amount of customer cancellations. *See* NetSolve's Motion to Dismiss, at 4; *see also* Individual Defendants' Motion to Dismiss, at 8. As noted, however, this sentence is suscepti-

ble to two reasonable interpretations. At the motion to dismiss stage, the benefit of the doubt goes to the plaintiffs. NetSolve also argues the 10–K form was not misleading because the plaintiffs did not allege a "material number" of customer cancellations. *See* NetSolve's Motion to Dismiss, at 4 and 7–8. Contrary to the defendants' representations, however, the plaintiffs identify one cancelled contract (BT), and two lost deals (BellSouth and the company that acquired BT) due to service problems. The plaintiffs allege these as "examples" and allege the customer losses—both of existing and potential customers—were "significant." The plaintiffs base these allegations on information acquired from four former NetSolve employees. Although the issue is a close one, the Court cannot say, at the motion to dismiss stage, and even under the heightened pleading requirements for fraud, that the plaintiffs have failed to allege that, as of April 2000, a significant problem of customer cancellations existed at NetSolve.[8] This ground for dismissal also is overruled.

■ Finally, NetSolve claims the plaintiffs "do not even attempt" to allege how the information in the July 5, 2000 analyst report was misleading, and fail to properly allege that the information was provided by the defendants. *See* NetSolve's Motion to Dismiss, at 5. Once again, the defendants ignore the plaintiffs' contention that the July 5, 2000 analyst report, like the other challenged statements, was misleading because it *omitted* NetSolve's four purported problems. *See* Complaint, at ¶¶ 56–57. In addition, the complaint alleges the defendants provided the analyst with the information used in this report

---

8. The Court notes the defendants' focus on this statement in the 10–K—which discusses data only as of March 31, 2000—seems irrelevant, since the plaintiffs do not allege the customer cancellations occurred until April 2000. The Court further notes the defendants

again fail to address the heart of the plaintiffs' claims: that it was misleading to *omit* the other purported problems from the 10–K, to the extent these problems are alleged to have existed as of March 31, 2000.

(or, more to the point, failed to provide information regarding the alleged problems at NetSolve) in the defendants' May 2000 "press release [and] conference call," as well as in "follow-up meetings and/or discussions with this analyst firm." *See* Complaint, at ¶ 55. At the motion to dismiss stage, this is sufficient. NetSolve's motion to dismiss on this ground is overruled.

## B. Allegation that AT & T Sales Were Declining

 Next, NetSolve argues the allegation that AT & T sales were declining "lacks an adequate basis and the required specificity" because it is based on an unnamed source who is "not alleged to have worked in sales or been privy to sales information," and because "revenue" from AT & T was increasing through the June quarter. *See* NetSolve's Motion to Dismiss, at 6. Although it is true the plaintiffs do not provide the name of their source for the AT & T sales allegation, the Court agrees with the Second Circuit that the PSLRA does not require a plaintiff to name its confidential sources. *See Novak*, 216 F.3d at 313–14 ("[E]ven if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."). Here, the plaintiffs have identified their personal source for this information as "Consultant # 2" and described his former position at NetSolve as "serv[ing] on customer related technical projects as an engineering manager." *See* Complaint, at ¶ 29. AT & T was NetSolve's primary customer. It is conceiva-

ble that an engineering manager who consulted on "customer-related" projects could have had knowledge of the number of AT & T installations. In addition, while the defendants repeatedly point to the alleged increase in *revenue* from AT & T over the June quarter, they do not address the allegation in this lawsuit—that *sales* to AT & T were declining. Sales and revenue are not the same. This ground for dismissal is overruled.

## C. Allegation that Switching to Large Contracts Reduced Short–Term Revenue

 NetSolve also contends the plaintiffs fail to allege "with the requisite particularity" that any delay in short-term revenue caused by NetSolve's switch to larger contracts occurred during the class period. *See* NetSolve's Motion to Dismiss, at 7. The Court agrees. In their complaint, the plaintiffs fail to state when this revenue delay became apparent. In the section entitled "undisclosed adverse information," the only mention of this alleged problem is in the next-to-last paragraph, which simply quotes an analyst report from August 18, 2000—the last day of the class period—that NetSolve "is finding" the larger contracts take longer to implement, and that this problem "was not anticipated." *See* Complaint, at ¶ 40. There is nothing alleging how the defendants knew of this problem prior to August 18, 2000.[9] *In addition, unlike some of the* plaintiffs' other allegations, this purported problem is not based on information from specific sources and does not contain an explanation of how the defendants were aware of the problem during the class period. In sum, the plaintiffs do not sufficiently allege how the short-term revenue

9. Although the plaintiffs later allege the defendants knew "by at least the beginning of the Class Period" that NetSolve's "implementation cycles were lengthening," *see* Complaint, at ¶ 80, the plaintiffs provide nothing to ex-

plain this statement. The plaintiffs also allege the defendants were "well aware" of this problem, but do not state how or when they were so aware. *See id.* ¶ 41.

delay problem existed during the class period, and how the defendants were aware of the problem at that time. Accordingly, the allegation that the defendants fraudulently failed to disclose NetSolve was experiencing a short-term revenue delay caused by the implementation of large contracts, is dismissed from the complaint without prejudice.

### D. Allegation that Customer Service Problem Existed

██ NetSolve also contends the plaintiffs "fail to establish" that a customer service problem existed at NetSolve because the plaintiffs "establish" [10] only one lost customer and admit that NetSolve experienced a net gain in customers during the class period. *See* NetSolve's Motion to Dismiss, at 7–8. As discussed, however, the plaintiffs allege more than this—they allege at least one cancelled contract and two lost deals—and the Court has already found the plaintiffs' allegation of the significance of this problem (barely) sufficient to survive a motion to dismiss. This ground for dismissal is overruled.

### E. Allegation that Sales Force Turnover Caused Lost Additional Sales/Revenue

██ NetSolve next argues the allegation that it experienced a high sales force turn-over causing lost additional sales/revenue "lacks particularity" because the plaintiffs do not describe the degree of the lost sales/revenue, and do not allege the basis for this purported problem. *See* NetSolve's Motion to Dismiss, at 8–9. The Court agrees. The plaintiffs contend that NetSolve, at some undisclosed time during the class period, experienced a high turnover in its sales force causing it to lose "additional sales" and "additional revenue" from its "existing" non-AT & T customers. *See* Complaint, at ¶¶ 36, 41 and 46(b). This allegation, however, only floats about the perimeter of the complaint.[11] The plaintiffs never allege how significant the lost sales/revenue were, or how the defendants would have known about it.[12] The plaintiffs' general and unsupported references to this problem do not satisfy the securities fraud pleading-with-particularity requirement. Accordingly, the allegation that the defendants fraudulently failed to disclose NetSolve was losing additional sales/revenue because of a high turnover in its sales force, is dismissed without prejudice.

### F. Scienter

██ Finally, NetSolve contends the plaintiffs have failed to adequately plead scienter because the plaintiffs fail to estab-

---

**10.** The Court notes that, to the extent the defendants argue the plaintiffs must "establish" facts to survive a motion to dismiss, this argument is more appropriate at the summary judgment stage. At the motion to dismiss stage, the plaintiffs need only *allege* facts sufficient to describe the purported fraud with the requisite particularity. *See Williams*, 112 F.3d at 178; *Kasaks*, 216 F.3d at 313–14. In addition, the plaintiffs need not allege "all" facts that may be "related" to their claims, as NetSolve apparently contends. *See* NetSolve's Reply, at 5. Such a requirement is impossible at the pleading stage because, in nearly every securities fraud case, only the defendants know "all" the facts related to the

alleged fraud. The PSLRA may have changed federal securities law; it did not eliminate it.

**11.** Indeed, the plaintiffs never even contend this secret problem was disclosed to the market, and/or that its revelation caused Net-Solve's stock price to fall.

**12.** At best, the plaintiffs allege that, as of April 2000, the defendants were aware that "new" reseller clients were not generating "a significant amount" of revenue. *See id.* at ¶ 80. However, this allegation relates to "new" clients, not the loss of sales/revenue from "existing" clients mentioned in the rest of the complaint. In addition, the plaintiffs provide no basis for this allegation.

lish scienter for the individual defendants, and because NetSolve was "a victim of the alleged scheme" of the individual defendants to artificially raise NetSolve's stock price. *See* NetSolve's Motion to Dismiss, at 9.

As discussed in the following section, the Court finds the plaintiffs' allegations regarding the individual defendants' scienter sufficient to survive at the motion to dismiss stage. To support its contention that the individual defendants' scienter cannot be imputed to NetSolve because the defendants plotted to harm the company, NetSolve cites to *Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405, 407 (5th Cir. 1993). In *Kaplan*, the Circuit dismissed a securities fraud complaint against the company, because the two individual defendants had acted to steal money directly from the company for their personal use. *See id.* ("[T]he knowledge and actions of employees acting adversely to the corporate employer cannot be imputed to the corporation."). Here, however, the plaintiffs allege the individual defendants acted to artificially raise NetSolve's stock price, not directly steal money from its coffers. An artificial raise in the stock price, in most cases, benefits the company. In addition, the vast majority of securities fraud cases (in this Court, at least) allege that individual defendants misled the market to artificially raise their company's stock price, and then sold their shares. If the Court were to accept the defendants' argument, such causes of action would be eliminated. While this is an appealing prospect in terms of the Court's workload, it is not a valid application of the federal securities laws. This ground for dismissal is overruled.

## II. Individual Defendants' Motion to Dismiss

### A. Scienter

■ In their motion to dismiss, the individual defendants first argue the plaintiffs fail to plead scienter because they have not "established" the undisclosed problems were "obvious" to the individual defendants during the class period. *See* Individual Defendants' Motion to Dismiss, at 3–4. However, the individual defendants were four of the top officers/directors of NetSolve, and three of them (Tysdal, Kieley and Budow) were directly responsible for discussing the company's business with the public. The plaintiffs have alleged AT & T was NetSolve's primary customer—indeed, was the lifeblood of the company—and that sales to AT & T were declining during the class period. If true, this information would have been "so obvious that the defendant[s] must have been aware of it." *See Tuchman*, 14 F.3d at 1067.[13] Similarly, the plaintiffs have alleged, barely but adequately, that during the class period NetSolve was experiencing a "significant" loss of other customers due to service problems. If true, this alleged problem also would have been "obvious" to persons in the defendants' positions, particularly in light of the alleged customer service internal report released at NetSolve in April 2000, *see* Complaint, at ¶ 39, and omitting this problem when discussing customer growth could have gone beyond mere negligence. Thus, the plaintiffs are not alleging scienter based solely on the individual defendants' positions as officers at NetSolve. *Cf. Coates*, 26 F.Supp.2d at 916. They have adequately alleged problems of such a nature that, if true, would have been obvious to the individual defendants. This ground for dismissal is overruled.[14]

---

**13.** The individual defendants also argue Net-Solve's hiring of additional DSU staff was inconsistent with a decline in AT & T sales. *See* Individual Defendants' Motion to Dismiss, at 4. This argument may be relevant at summary judgment; it is not pertinent here.

**14.** As discussed, the other two alleged undisclosed problems—a delay in short-term reve-

## B. Falsity of Budow's May 18, 2000 Forward–Looking Statement

■ Next, the individual defendants contend the plaintiffs fail to allege defendant Budow's May 18, 2000 statement that there was "no reason not to expect" Net-Solve to exceed analysts' earnings estimates was not made with actual falsity. *See* Individual Defendants' Motion to Dismiss, at 4–5. Again, however, the defendants ignore that falsity can occur by omitting information. As previously discussed, the alleged decline in AT & T sales since January 2000, and the alleged "significant" loss of other customers since April 2000, reasonably could have been "reasons to expect" NetSolve might not exceed the earnings estimates, particularly if these problems had been disclosed to the market. This argument also is overruled.

## C. Improper Pleading of Motive and Opportunity to Commit Fraud

■ The individual defendants next contend the plaintiffs improperly plead scienter by alleging the defendants had the motive and opportunity to commit fraud. *See* Individual Defendants' Motion to Dismiss, at 5–7. It is true this Court has previously stated that "under the PSLRA (at least as interpreted by the Eleventh Circuit) it no longer appears that 'allegations of motive and opportunity to commit fraud, standing alone, are sufficient to establish scienter.' " *See In re Pervasive Sec. Litig.*, No. A 99–CA–721–SS, July 21, 2000 Order [# 58], at 25 (quoting *Bryant*, 187 F.3d at 1285). As noted, however, other circuits, and notably the Second Cir-

cuit, have more recently held motive and opportunity, standing alone, are enough to plead scienter under the PSLRA. *See Novak v. Kasaks*, 216 F.3d 300 (2nd Cir.2000), *cert. denied*, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000). The Fifth Circuit has yet to address this issue. In any event, the Court has already concluded that the plaintiffs' scienter allegations are sufficient without reference to the allegations of motive and opportunity. This ground for dismissal is overruled.

## D. Group Pleading

■ Next, the individual defendants argue each of them may only be responsible for his own statements to the public, and may not be liable under a "group pleading" theory. *See* Individual Defendants' Motion to Dismiss, at 7–9. Under this securities fraud theory, high-level corporate officers may be responsible for statements issued by their company to the public. Whether this pleading theory survives the PSLRA is a subject of dispute among the federal district courts.[15] *See, e.g., Coates*, 100 F.Supp.2d at 421 n. 2. The Court generally agrees with the district courts holding that group pleading is no longer viable. The PSLRA clearly changed the securities laws to require more particularity in pleading fraud. At the minimum, to state a claim against an individual defendant, a plaintiff must allege the defendant contributed in some manner to a misleading statement. Thus, if a plaintiff explains how the defendant was involved in a misleading press release or analyst conference call, that is suffi-

---

nue and lost additional sales/revenue caused by the sales force turnover—are not plead with the requisite particularity.

**15.** The defendants contend group pleading "was improper in this [the Fifth] Circuit before the Reform Act." *See* Individual Defendants' Motion to Dismiss, at 7. However, the two Fifth Circuit cases cited for this proposi-

tion do not deal at all with group pleading, but state only the general rule that a fraud complaint must allege who made a misleading statement and when. *See Williams*, 112 F.3d at 177–80; *Tuchman*, 14 F.3d at 1068. These cases do not deal with whether all the defendants can be held responsible for one defendants' fraudulent conduct.

cient. Or, if a plaintiff explains how the defendant ratified or helped prepare another defendant's misleading public statement, this may suffice. Even the courts accepting group pleading after the PSLRA have commented that "[o]bviously, Plaintiffs' recovery, if any, against a particular defendant will be limited to those misrepresentations to which Plaintiffs can prove that defendant contributed." *Zuckerman v. Foxmeyer Health Corp.* 4 F.Supp.2d 618, 626 n. 4 (N.D.Tex.1998); *see also In re Sirrom Capital Corp. Sec. Litig.*, 84 F.Supp.2d 933, 939 (M.D.Tenn.1999) (allowing group pleading where misleading document was alleged to be "the collective product" of the individual defendants).

■ Here, the plaintiffs have not alleged that defendant Pojman contributed in any manner to the allegedly misleading statements. He is not listed as participating in any conference calls or press releases. Pojman is sued solely because he was the Vice President of Operations at Net-Solve, and because he allegedly sold some 10,600 shares of his stock during the class period (the lowest amount of any of the individual defendants). That is not enough to keep him in this lawsuit. The plaintiffs must allege, with particularity, how Pojman had a direct hand in at least one of the allegedly misleading statements. They have not done so, and therefore all claims against Pojman individually in this lawsuit are dismissed without prejudice. The other individual defendants will remain, however, because the plaintiffs allege (and the documents submitted by the defendants show) that Tysdal, Kieley and Budow helped prepare, directly participated in, and/or were quoted in the allegedly misleading public statements and documents.

**E. Controlling Persons**

■ Finally, the individual defendants claim the plaintiffs fail to adequately allege any of the individual defendants were "controlling persons" under § 20(a) of the Securities Exchange Act. *See* Individual Defendants' Motion to Dismiss, at 9–10. Section 20(a) provides, in pertinent part, that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). The plaintiffs have adequately alleged defendants Tysdal, Kieley and Budow had actual power or influence over NetSolve's corporate activities and policies, and over the activities alleged to be fraudulent. Each was at the top of NetSolve's corporate ladder. As noted, these defendants were the three contact people listed on the allegedly misleading press releases, and were the only three persons who participated on behalf of NetSolve in the allegedly misleading conference calls.[16] This is enough to allege § 20(a) controlling person liability. *See Abbott v. Equity Group, Inc.*, 2 F.3d 613, 620 (5th Cir.1993). This final ground for dismissal is overruled.

In accordance with the foregoing, the Court enters the following orders:

IT IS ORDERED that Defendant Net-Solve, Inc.'s Motion to Dismiss [# 20] is GRANTED IN PART and DENIED IN PART as described in this order;

IT IS FURTHER ORDERED that the Individual Defendants' Motion to Dismiss [# 19] is GRANTED IN PART and DENIED IN PART as described in this order;

16. Again, the plaintiffs do not allege Pojman was sufficiently linked to the NetSolve corporate activities and policies that are the subject of the alleged fraud. Thus, the plaintiffs also fail to allege Pojman is liable under Section 20(a).

IT IS FURTHER ORDERED that the plaintiffs shall have fifteen (15) days from the date of this order to amend any portion of their complaint dismissed in this order; this ruling does not grant the plaintiffs leave to amend their complaint in any other manner; and

IT IS FINALLY ORDERED that the plaintiffs confer with the defendants and submit a proposed scheduling order for the Court's consideration within fifteen (15) days of the date of this order.