In re ELECTRONIC DATA SYSTEMS CORP. SECURITIES AND "ERISA" LITIGATION.

Nos. 6:03–MD–1512, 6:03–CV–110.

United States District Court, E.D. Texas, Tyler Division.

Jan. 13, 2004.

Debbie Branscum and Elton Joe Kendall of Provost, Umphrey, Dallas, TX,

Deborah R. Gross, Law Offices of Bernard M. Gross, Philadelphia, PA, for Plaintiffs Michael Feder Mayer and Barbara Horwitz.

Debbie Branscum, of Provost, Umphrey, Dallas, TX, for Gregory R. Miller, Craig, Thompson.

Roger F. Claxton, of Claxton & Hill Dallas, TX, for Barry Family, LLP Lief Thorne–Thomsen, William J. Kluemper.

William B. Federman, of Federman & Sherwood Oklahoma City, OK, for Marc Abrams, John Braun, Glen W. Vanderwarter, John J. Britt, Jr., Stanley Sved, Haddon Zia, Jennifer Chana Fink.

Roger B. Greenberg, of Schwartz Junell Campbell & Oathout, Houston, TX, for Stephen M. Harnik, Mark Jacobson, DO.

Grace Ann Weatherly of Wood, Thacker & Weatherly, Denton, TX, for John McLoughlin.

Sherrie R. Savett, Christopher L. Nelson of Berger & Montague, Philadelphia, PA, for Stanton Discount Pharmacy.

Mel E. Lifshitz, Joseph R. Seidman, Jr. of Bernstein, Liebhart and Lifshitz, New York City, for Henry Spitzer.

Christopher J. Gray of Lovell, Stewart & Halebian New York City, for Jennifer J. Fadem, Steven A. Goldberg.

Joseph H. Weiss of Weiss & Yourman, New York City, Jules Brody of Strull, Strull & Brody, New York City, for Vladimir Spira, MD.

Jules Brody of Strull, Strull & Brody, New York City, for Samuel Zaks.

Roger F. Claxton of Claxton & Hill, Dallas, TX, Leigh R. Lasky of Lasky & Rifkind, Chicago, IL, for Marshall Kwait.

G. Irvin Terrell, Shira Radinsky Yoshor of Baker Botts, LLP, Houston, TX, Larry Dean Carlson of Baker Botts, LLP, Dallas, TX, Kirk Alan Parry, Jr. of Smith,

Anderson, Blount Dorsett, Mitchell & Jernigan, Raleigh, NC, for Defendants Electronic Data Systems Corporation, James E. Daley, Richard H. Brown and Paul Chiapparone.

Richard P. Keeton of Nickens, Keeton, Lawless, Farrell & Flack, Houston, TX, Alan Schulman of Bernstein, Litowitz, Berger & Grossman, San Diego, CA, Michael Himmel of Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, Woodbridge, NJ, for Securities.

### PRACTICE AND PROCEDURE ORDER NO. 5 (SECURITIES LITIGATION)

DAVIS, District Judge.

Defendants Electronic Data Systems Corp. ("EDS"), Richard Brown ("Brown"), and James Daley ("Daley") have filed a Motion to Dismiss the Amended Consolidated Class Action Complaint (Docket No. 43).[1] Plaintiffs have alleged that EDS and certain members of its management fraudulently inflated EDS' stock price through improper accounting and material misrepresentations in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder, and Section 20(a) of the Securities Exchange Act of 1934. EDS, Brown, and Daley (collectively "Defendants") move to dismiss Plaintiffs' claims under Federal Rules of Civil Procedure 9(b) and 12(b)(6), as modified by the Private Securities Litigation Reform Act of 1995 ("PSLRA").

Plaintiffs allege that Defendants artificially inflated the price of EDS stock by illegally misrepresenting facts concerning EDS' earnings during the proposed class period. Section 10(b) of the Securities Exchange Act of 1934 provides in relevant part:

It shall be unlawful for any person directly or indirectly ... (b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Additionally, Rule 10b–5, promulgated by the SEC pursuant to Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly ... (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Plaintiffs allege that EDS deceptively recognized revenue and represented that it was performing according to schedule on one of its largest contracts. Plaintiffs further allege that EDS' improper accounting and misrepresentations caused its stock to trade at artificially high values. Allegedly, when the truth regarding the contract in question was finally revealed, EDS stock took a sharp loss and injured the proposed class members. Moreover, Plaintiffs allege that defendants Brown and Daley are liable under Section 20(a) of the 1934 Act as persons who controlled EDS' scheme to defraud investors. Having considered the parties' submissions and oral argument, the Court **DENIES** Defendants' motion.

### STANDARD OF REVIEW

As a preliminary matter, the Court notes that this Opinion should not be read as taking any position on this case's ulti-

---

1. All docket numbers in this Opinion refer to the MDL docket under 6:03–MD–1512.

mate disposition. The Court makes this observation because of the somewhat unique procedural posture that the PSLRA creates. As in all Rule 9(b) and 12(b)(6) motions to dismiss, the Court accepts all of Plaintiffs' factual allegations as true. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 341 (5th Cir.2002). However, as discussed in detail *infra*, the PSLRA requires the Plaintiffs' *pleadings* to raise a "strong inference" that the Defendants acted with scienter. Therefore, unlike most Rule 9(b) and 12(b)(6) motions, this motion requires the Court to evaluate the persuasiveness of Plaintiffs' allegations to a certain extent. This Opinion does not, and should not be read as, taking any position on what actually happened or any ultimate resolution of this case. Rather, this Opinion merely reflects the facts *as alleged* by Plaintiffs and evaluates those alleged facts' persuasiveness only to the extent necessary to determine a "strong inference" of scienter.

## BACKGROUND[2]

### EDS and the NMCI Contract

The events underlying this action began with the largest outsourcing project ever pursued by the United States Government. The United States Navy took bids from various companies to create a highly-secure intranet network that would connect approximately 350,000 desktop computers (also called "seats") scattered over approx-imately 300 military bases worldwide. The Navy ultimately awarded EDS the $6.9 billion Navy Marine Intranet Contract ("NMCI Contract") that was to be performed over five to seven years.[3]

EDS provides a wide-range of information technology services to large companies and governmental entities, and commonly handles large scale technology contracts.[4] In fact, EDS derived more than 75% of its revenues during the alleged class period[5] from its Information Solutions business line.[6] As a result of EDS' business model, the investment community valued the company primarily upon its ability to ensure significant revenue growth by winning large long-term contracts guaranteeing future revenues. Not only is EDS one of a few companies that could successfully perform a contract of the NMCI's size and complexity, but its business model necessitates winning large long-term contracts.

### Problems with the NMCI Contract

Despite EDS' size and experience, the NMCI Contract quickly encountered potentially fatal problems. For example, as early as the first quarter of 2001, EDS knew that it could not transfer necessary "legacy software" from the Navy's old system to the new NMCI Intranet as required by the NMCI Contract. By 2002, EDS had identified more than 100,000 legacy software applications that it could not

---

**2.** This Background section reflects the facts as alleged by Plaintiffs in the Amended Consolidated Class Action Complaint (Docket No. 43).

**3.** All parties refer to the contract as the NMCI Contract despite the fact that they have represented to the Court that the contract is named the Navy Marine Intranet Contract. Although the Court speculates that NMCI stands for Navy and Marine Corps. Intranet, for ease of reference the Court simply refers to the contract as the parties have.

**4.** EDS' handling of large scale contracts is highlighted by Plaintiffs' allegation that the NMCI Contract is only the fourth most significant event in EDS' history.

**5.** February 7, 2001 to September 18, 2002.

**6.** The Information Solutions business line includes the NMCI Contract.

transfer to the new intranet. A May 6, 2002 email from Naval Air NMCI Transition Manager George Kalnasy recognized the legacy software problems and detailed other problems with the new intranet, including: failure to provide remote access service to 61% of users testing the new intranet, failure to provide secure web access, and failure to provide adequate "help desk" support.[7]

After the Navy deferred approximately $628 million in orders for non-compliance with the NMCI Contract, the Institute for Defense Analysis ("IDA") conducted an independent review of the NMCI Contract that revealed additional problems. The IDA's testing, completed in Spring of 2002, revealed that the slow rate of converting legacy software applications presented a high risk to the project and did not comply with EDS' own deployment schedule. The IDA also identified problems with EDS' Enterprise Management System ("EMS"), the system enabling EDS (1) to manage a network with the NMCI's complexity and (2) to capture and report performance data. Moreover, the IDA found that the seat roll-out process, critical to meeting the NMCI Contract's deployment schedule, lacked proper management and oversight. Specifically, the IDA found that "ineffective coordination of customers for delivery of desktops caused high unavailability rates (20–50 percent), and lack of product assurance process caused significant rework. As a result, the seat roll-out rate remained well below the desired 100 seat-per-day-per site rate."

Plaintiffs contend that because of serious delays and performance problems, EDS embarked on a "scorched earth" policy that intentionally accelerated the production of non-conforming workstations. By June 2002, more than 18 months after the Navy awarded EDS the NMCI Contract, EDS had failed to transition even 5% of the workstations called for under the contract. Rather than correcting the numerous problems in the NMCI Contract, EDS chose to correct the NMCI Contract by meeting the seat roll-out schedule regardless of whether the seats it provided complied with the NMCI Contract. EDS NMCI Program Director Mike Hatcher outlined the scorched earth policy in an April 25, 2002 email:

We have agreed with [Rear Admiral] Munns and the Navy that ruthlessly rolling seats is the only way for NMCI to survive and prosper. Gen. Edmonds characterized this approach in a meeting with RADM Munns as scorched earth seat rollout, and I think that pretty much tells the story. Our present way of working would probably only result in

---

7. The Court notes that the parties have presented significant documentary evidence in the initial pleadings and motions to dismiss. Presenting such evidence at this early stage in the proceedings is not uncommon in cases affected by the Private Securities Litigation Reform Act of 1995 ("PSLRA") because of the stringent pleading requirements the PSLRA imposes (discussed *infra*). Typically, considering outside evidence in a motion to dismiss transforms the motion into one for summary judgment. Fed.R.Civ.P. 12. However, none of the evidence considered by the Court in the instant motion transforms it into a motion for summary judgment. First, all parties stated on record that they did not object to the Court considering the evidence presented in the context of a motion to dismiss. Second, none of the evidence the Court considered is of a type that will transform the motion into a motion for summary judgment because it is either: (1) a document required to be filed and actually filed with the SEC, *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996); (2) facts of which the Court takes judicial notice, *Lovelace*, 78 F.3d at 1018; or (3) documents referred to in the Plaintiffs' Complaint and essential to the Plaintiffs' claim, *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir.2000) (citing *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir.1993)).

about 60,000 seats rolled out in 2002, which if left unchanged would spell an end to the NMCI program by summertime. We've come too far to let that happen ...

The bottom line is we're going to roll seats, and will be diverting many resources to this goal. Any obstacle that gets in the way will be crushed. No more IATO delays [certifications from the Navy that the new workstations comply with security standards promulgated by the Department of Defense and are approved to operate], application packaging delays, can't get the [applications], can't get the user-to-apps mapping, can't get the definitzed order, etc. We will set the seat rollout schedule, and everything else will be slave to that. If [software applications] are not there, they will get a vanilla NMCI seat with nothing but the gold disk [the standard software installed on new intranet terminals]. *If the order is not definitized, they will get a seat type of [EDS'] choosing.*

However, on June 25, 2002 the House Committee on Appropriations ("Committee") found severe defects in the NMCI Contract's implementation. The Committee questioned EDS' representations that the NMCI intranet was "ready for widespread deployment" and found that "excerpts from [EDS'] report are indicative of this questionable conclusion and clearly demonstrate the shortcomings of testing."

The Committee recommended that additional orders under the NMCI contract wait until testing confirmed that EDS had proved that even 5% of the seats were fully operational and compliant with the NMCI Contract.[8]

*Questionable accounting on the NMCI Contract*

A securities fraud claim, however, does not arise simply from failed business. Plaintiffs' complaint stems from EDS' accounting methods during the proposed class period. Plaintiffs allege that despite EDS' knowledge of the NMCI Contract's problems, EDS improperly used accounting methods that artificially inflated its stock price. Furthermore, Plaintiffs allege that EDS misrepresented progress on the NMCI Contract in its press releases and Securities and Exchange Commission ("SEC") filings. Plaintiffs allege they were harmed when their EDS stock sharply fell after they had purchased it at prices artificially inflated by EDS' improper accounting and false disclosures.

Plaintiffs complain that EDS improperly used percentage of completion accounting ["POC"]. Although Generally Accepted Accounting Principles ("GAAP") typically require entities to recognize revenue only after they have completed performance under a contract, in certain limited circumstances, GAAP permits entities to recognize revenue as soon as they incur costs. The American Institute of Certified Public Accountants ("AICPA")[9] declares that

8. The Committee declared: "The Committee believes it would be most beneficial for the Navy and NMCI if additional seat orders were delayed as part of this contract extension pending independent operational test and evaluation. Therefore, the Committee has included a general provision that prohibits the Navy from ordering additional seats above the current 160,000 authorized ... and requires that operational test and evaluation be conducted once there has been a full transition of not less than 20,000 workstations to the Navy–Marine Corps Intranet and the network is robust enough so as to perform adequate testing. The Committee believes that the delay in seat orders that will result will also provide the Navy and [EDS] much needed time to address the legacy application problems which will arise from the order of the first 160,000 seats."

9. The Court takes judicial notice that the AICPA is the national, professional organiza-

"the percentage-of-completion method recognizes income as work on a contract progresses; recognition of revenues and profits generally is related to costs incurred in providing the services required under the contract." [10] In other words, a company may recognize a dollar of revenue for every dollar of cost it incurs as it incurs costs. In contrast, according to the AICPA, "the completed-contract method recognizes income only when the contract is completed, or substantially so, and all costs and related revenues are reported as deferred items in the balance sheet at that time." [11]

GAAP limits the use of POC accounting. First, entities may only use percentage of completion accounting when they can dependably estimate costs to complete the contract.[12] Second, entities must have adequate assurance that they will break-even or make a profit on the contract. Furthermore, when companies may use POC accounting, they may only recognize revenue using POC to the extent they have completed work on the contract.

Plaintiffs allege that EDS could not satisfy the criteria to use POC accounting. Because of the allegedly extensive problems with the NMCI Contract, noted above, Plaintiffs contend that EDS could not dependably estimate costs on the NMCI Contract. For example, cost overruns forced EDS to terminate 10% of its NMCI workforce. Additionally, Plaintiffs contend that EDS did not have adequate assurance that it would break even on the NMCI Contract because, in addition to the Contract's extraordinary size and pervasive problems, EDS won the NMCI Contract by calculating its bid with a 4% profit margin instead of its normal 7% profit margin.

Even if EDS was allowed to use POC accounting, Plaintiffs allege that EDS misled them by improperly using POC accounting to recognize unearned revenue. In the NMCI Contract, EDS recognized revenue as it incurred costs without regard to how the costs reflected the percentage of the project that EDS had completed. Thus, for every dollar that an EDS employee billed for time spent or materials, EDS recognized one dollar of revenue. Plaintiffs claim that this was improper because the Navy had the right to reject non-compliant services and seats, and because EDS knew that much of its work would not meet Navy specifications. Furthermore, by recording costs as revenues, EDS had recorded $1.6 billion in revenues. Because revenues under POC accounting are to mirror the completed percentage of

tion for all certified public accountants. The AICPA is responsible for establishing and maintaining standards and requirements of professional conduct among certified public accountants.

10. Accounting Research Bulletin No. 45, Long–Term Construction Type Contracts, issued by the AICPA Committee on Accounting Procedure in 1955.

11. *Id.* The AICPA also specifies when entities should use POC versus completed-contract: "The committee believes that in general when estimates of costs to complete and extent of progress toward completion of long-term contracts are reasonably dependable, the percent-

age of completion method is preferable. When lack of dependable estimates or inherent hazards cause forecasts to be doubtful, the completed contract method is preferable" *Id.*

12. Specifically, entities performing contract work may not recognize revenue under POC accounting: (1) if the contractor does not have the "ability to make reasonably dependable estimates ... of the extent of progress toward completion, contract revenues, and contract costs," or (2) if "inherent hazards make estimates [of progress, revenues, or costs] doubtful." AICPA Statement of Position 81–1, *Accounting for Performance of Construction–Type and Certain Production–Type Contracts.*

a project, Plaintiffs allege that EDS' $1.6 billion revenues represented that it had completed 23% of the $6.9 billion NMCI contract. Plaintiffs allege that this is a fraud because EDS had failed to meet the Navy's standards for even 5% of the workstations under the NMCI Contract when its revenues represented that it had completed 23% of the contract.

Plaintiffs further assert that the NMCI Contract is not the first time that EDS encountered problems with POC accounting. For example, in the fourth quarter of 1998, EDS reduced its reported earnings by $200 million due to problems encountered on a contract with Xerox. Like the present case, EDS reduced earnings realized under the POC method because of unexpected costs on the Xerox project. Additionally, an internal EDS auditor stated that if EDS budgeted $500,000 for a project, it would declare the project 50% completed when it had incurred $250,000 in costs, even if the project was only 10–20% complete. Furthermore, in a contract with Golden Cross, Brazil's largest medical insurance company, EDS continued to recognize its costs as revenues under the POC method despite the fact that EDS knew it could not complete the contract for Golden Cross. Senior EDS management acknowledged the Golden Cross POC violation in 1999 after an external auditor from KPMG LLP brought it to their attention.

*EDS' NMCI misrepresentations overvalued its stock*

According to Plaintiffs, EDS' questionable accounting overinflated EDS stock's value by hiding the significant problems in the NMCI Contract. Defendants Brown and Daley, EDS' Chief Executive Officer [13] and Chief Financial Officer [14] respectively, were allegedly responsible for the fraudulent scheme to inflate EDS stock's value. Plaintiffs allege that even though Brown and Daley knew that the POC accounting was misrepresenting EDS' revenues, they made false statements and did not reveal the losses concealed by POC accounting in an effort to artificially inflate EDS stock's value.

Plaintiffs contend that Brown and Daley were the EDS employees most responsible for disseminating information that the markets use to value EDS stock. Brown and Daley were responsible for ensuring the accuracy of EDS' financial reports and SEC filings throughout the proposed class period. They both signed each of EDS' annual reports on Form 10–K, as filed with the SEC, for fiscal years 2000, 2001, and 2002. They also each filed sworn certifications with the SEC, in which each one individually attested to the accuracy of EDS': (1) reported financial results for Fiscal 2001, (2) reported financial results for the first three quarters of Fiscal 2002, and (3) annual report on Form 10–K for Fiscal 2002. Both attested to the SEC that they: (1) were responsible for establishing and maintaining disclosure controls and procedures, (2) designed these controls to ensure that material information relating to EDS was made known to them, and (3) had evaluated the effectiveness of EDS' disclosure controls and procedures within 90 days of the certifications.[15] In addition to EDS' communications to the

**13.** Brown served as a director and Chief Executive Officer of EDS from January 1999 until his termination in March 2003.

**14.** Daley served as Executive Vice President and Chief Financial Officer from January 1999 until his reassignment in January 2003.

**15.** Brown made this certification to the SEC on November 14, 2002 and March 12, 2003. Daley made this certification only on November 14, 2002.

SEC, Brown and Daley were principally responsible for EDS' communications directly to investors. Brown commented on EDS' financial performance in each earnings statement released during the proposed class period and he communicated directly to investment analysts concerning EDS' financial results in quarterly conference calls throughout the class period.[16] Daley, participated with Brown in communicating with securities analysts and investors.[17]

In addition to being responsible for informing investors of EDS' condition, Plaintiffs allege that Brown and Daley knew of the NMCI Contract's problems based on their positions at EDS and relationship to the project. Brown received daily reports on EDS' major long-term contracts, including the NMCI Contract, which he used to determine the revenue EDS would recognize under GAAP.[18] Additionally, Brown convened monthly telephone conference calls with top EDS executives to review budgeted and actual monthly results for company projects.[19] Daley received the same reports as Brown and participated in the monthly telephone conference calls.

Despite daily reports and other regular updates regarding the NMCI Contract's problems, EDS through Brown and Daley allegedly represented to investors that the company was performing well. On February 7, 2001, the first day of the proposed class period, Defendants issued a press release reporting fourth quarter and year end revenues of $5.2 billion and $19.2 billion. The press release included approximately $10 million in revenue from the NMCI Contract. After the press release, EDS stock rose approximately 10% overnight, from $56.90 on February 7, 2001 to $62.51 on February 8, 2001. Over the following fiscal quarters, until the end of the proposed class period in September 2002, EDS represented ever increasing earnings and profits. EDS represented to the public at large and to reporters from investment resources such as Lehman Brothers and Morgan Stanley that its revenue growth was in part from the NMCI Contract.[20] Furthermore, EDS' SEC fil-

---

**16.** Plaintiffs specifically point to press releases and conference calls dated: February 7, 2001, April 25, 2001, July 25, 2001, October 24, 2001, February 7, 2002, April 22, 2002, and July 24, 2002.

**17.** Plaintiffs specifically point to a press release on July 24, 2002 and conference calls dated: February 7, 2001, April 25, 2001, July 25, 2001, October 24, 2001, February 7, 2002, April 22, 2002, and July 24, 2002.

**18.** One of the sources from which Brown received daily reports was EDS' "service excellence dashboard." The dashboard is an internet-based system that related information on over 90% of EDS' customers, including the Navy, to EDS upper management. The dashboard not only communicated status updates to management, but it also flagged project problems with a color-coded system based on problem severity. Brown has admitted to checking the internet-based dashboard every day, regardless of whether he was in the office or not.

Brown also received regular project reports through EDS' Cost Accounting System ("CAS"). The CAS contained daily-updated cost and budget information on EDS' contracts, including the NMCI Contract. Not only did Brown receive regular CAS updates, but he also received, by the seventh of every month, a comparison between expected budgeted costs and actual CAS budgets.

**19.** Approximately 150 EDS executives participated in these calls.

**20.** Plaintiffs, in pages 31 through 49 of the Amended Consolidated Class Action Complaint, set forth allegations of exactly what was said, by whom, and to whom on specific dates. Although Defendants move to dismiss under Rule 9(b), they make only one particularity argument. The Court deals with that argument in turn and notes that Plaintiff pled all other fact allegations in compliance with Federal Rule of Civil Procedure 9(b). This Opinion sets forth specific statements and

ings during the proposed class period represented that all accounting procedures were normal and that the company had recognized any losses incurred within that fiscal quarter. Based on EDS' representations to investors and to the SEC, EDS' stock price rose and market analysts recommended purchasing EDS stock.[21] According to Plaintiffs, even after hints that EDS was not performing as well as the market expected, analysts continued to rate EDS well because of confidence garnered by EDS leadership, specifically Defendants Brown and Daley.[22] Defendants promoted public confidence in EDS by representing that the company had strong internal controls (procedures) to ensure that all of its accounting and oversight was performed according to the highest standards.[23] Ultimately, in a September 18, 2002 press release, EDS revealed that the company's financial condition was not as it had appeared to be. The September 18 press release followed EDS' most recent rounds of positive reports to investors at the end of the third quarter 2002. EDS reported that expected total revenues were down 2–5% from the previous year, and

thus far below the 4–6% increase EDS had previously projected. In contrast to the $0.74 earnings per share EDS projected a month earlier, EDS declared that earnings per share would be $0.12–$0.15 per share. Allegedly as a result of the September 18 announcement, EDS shares plummeted from a closing price of $36.46 per share on September 18, 2002 to a $17.20 per share closing price on September 19, 2002. Although EDS did not specifically refer to the NMCI Contract in the September 18 announcement, market analysts connected EDS' POC accounting on the NMCI Contract to the poor report. For example, on September 19, 2002 Bear Stearns stated:

> We feel that there is a lot more to EDS' revised guidance than the factors cited by management. To the extent that EDS mispriced contracts over the past several years and then accounted for them under POC, we may be in for a prolonged period of depressed earnings at EDS.

Another analyst, FBR, downgraded EDS stock to "underperform" and questioned how such a great problem could have

---

their contexts in certain instances, but the Court finds that repeating all of the complaint's fact allegations regarding allegedly fraudulent statements is unnecessary.

**21.** For example, Goldman Sachs in a report dated April 26, 2001 stated "for years, EDS' weak point has been top line performance, and Q1/01 was the second consecutive quarter of better than expected growth, and well above historical levels. This is the evidence that last year's record contract wins are now translating into revenue." Friedman, Billings, Ramsey & Co. ("FBR") on October 5, 2001 recommended investors "accumulate" EDS shares stating "the revenue result of $5.5 billion was driven by strong performance across all company's lines of business ... on a year over year organic basis [Information Solutions] grew 21% driven by strong performance with the NMCI Contract...."

**22.** Lehman Brothers positively reviewed EDS despite cash flow concerns because "in [Leh-

man Brothers] view, the current EDS management has performed relatively well since being assembled in early 1999; Dick Brown and his team turned around a troubled organization ... we believe in the integrity of the EDS management team and that the CFO [Defendant Daley] and his reports are not playing accounting games to boost reported earnings."

**23.** For example, in an analysts' teleconference concerning EDS' financial policies and practices and its connection with Worldcom (shortly following the revelation of Worldcom's improper accounting), Defendants Brown and Daley represented that: EDS' accounting is "clear, conservative and concise," "EDS is a company with strong financial controls and the discipline to follow them," EDS "put a lot of controls and processes that absolutely minimize [EDS] risk."

"snuck up" on EDS management in the one month since the prior earnings statement. The *Wall Street Journal* similarly speculated that part of EDS' problems stemmed from questionable accounting practices.

*Revelations following the stock price collapse* [24]

Following the September 18 announcement, information continued to emerge regarding EDS' POC accounting during the class period. EDS' Quarterly 10–Q for third quarter 2002 declared to the SEC that EDS was severely behind schedule on the NMCI Contract and that "due to the continuing risk associated with the timing and type of seat deployment, [EDS] intend[s] to account for the NMCI Contract on a zero profit basis for the foreseeable future." Shortly thereafter, the SEC began a formal inquiry into the events leading up to the September 18 announcement that became a full investigation on January 17, 2003. After EDS terminated CEO Brown [25], new management announced that there had been a $334 million cumulative loss on the NMCI Contract. Subsequently, analysts connected EDS' losses to the NMCI Contract and predicted that it would generate operating losses over its entire life. Merrill Lynch declared:

> Finally, the management conceded to oversight issues at the Navy contract which will require increased project management and financial resources ... We are concerned by the revelation: NMCI has been perhaps the most visible contract in EDS' portfolio, and should already have received an unusual level of management scrutiny. This disclosure raises concerns about project forecasting and project management capabilities at less visible projects.

Furthermore, the new EDS management announced that the company and its outside auditors had reviewed the internal controls for the NMCI account and had found certain "significant deficiencies" in its operations.[26] EDS also reported that the $334 million loss "resulted from a decline in the average seat price based on the type seats ordered and expected to be ordered by the [Navy], as well as the reduced period of time in which to generate seat revenue due to deployment delays and associated incremental estimated operating costs."[27] Indeed, EDS management and its independent auditors determined that problems with the NMCI Contract

24. Contrary to Defendants' assertions, the allegations reflected in this subsection are not an attempt to prove "fraud by hindsight." The "fraud by hindsight" defense asserts that plaintiffs may not establish fraud merely by asserting that defendants should have anticipated future events and made certain disclosures earlier than they did. *See Novak v. Kasaks,* 216 F.3d 300, 309 (2nd Cir.2000). "Corporate officers need not be clairvoyant; they are only responsible for revealing material facts reasonably available to them." *Id.* (citing *Denny v. Barber,* 576 F.2d 465, 470 (2nd Cir.1978)). The allegations do not assert that Defendants should have clairvoyantly anticipated future events. Rather, these allegations tend to establish problems which existed *at the time* that the alleged misrepresentations occurred. *See In re Raytheon Securities Litiga-*

*tion,* 157 F.Supp.2d 131, 151 (D.Mass.2001) (holding "some reliance on post-statement revelations is appropriate ... when the nature of the problem is such that it likely would have been apparent to management before it was disclosed to the public").

25. EDS terminated Brown on March 20, 2003. EDS had previously transferred Daley from his position as CFO to Executive Vice President of Client Solutions Global Sales and Marketing.

26. Made in the first quarter earnings conference call with investment analysts on May 13, 2003.

27. EDS quarterly report on Form 10–Q for the period ended March 31, 2003.

were of a "reportable condition" under generally accepted auditing standards during the proposed class period.[28]

## SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934

■ To state a claim under § 10(b), a plaintiff must allege: (1) that the defendant made a misrepresentation or omission of material fact; (2) in connection with the purchase or sale of a security; (3) with scienter; (4) that the plaintiff relied upon; (5) causing the plaintiff to suffer damages. *Basic v. Levinson,* 485 U.S. 224, 230–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 406–07 (5th Cir.2001). Additionally, the PSLRA requires a plaintiff to: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief ... [to] state with particularity all facts on which the belief is formed"; and (2) "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1)–(2).

Defendants' motion to dismiss only attacks two of the elements that Plaintiffs must plead. First, Defendants argue that Plaintiffs' Complaint does not raise a "strong inference" that any of Defendants acted with the required mental state, or scienter. Second, Defendants claim that Plaintiffs cannot prove, based on the facts alleged, that any of Defendants' conduct caused Plaintiffs' injuries. The Court will address scienter and causation separately because the substantive pleading requirements for the two elements varies.

**28.** A reportable condition is defined as "significant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to initiate, rec-

## Have Plaintiffs adequately pled scienter?

Defendants attack Plaintiffs' scienter allegations by attacking the facts Plaintiffs pled one by one. Due to the complexity of the scienter pleading requirements, the Court will first address legal standards for pleading scienter. The Court will then address Defendants' attacks on the evidence and will finally determine whether the pled facts, that the Court may properly consider, meet the scienter pleading requirement.

*Legal standards for pleading scienter*

In the Fifth Circuit, plaintiffs must plead facts giving rise to a "strong inference" that defendants acted intentionally or severely recklessly to survive a motion to dismiss. The Supreme Court initially defined scienter in securities fraud cases as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Later, the Fifth Circuit held that "severe recklessness" also satisfied the scienter requirement. *Nathenson,* 267 F.3d at 409. Moreover, the Fifth Circuit defined severe recklessness in this context as:

> Severe recklessness, which, properly defined and adequately distinguished from mere negligence, resembles a slightly lesser species of intentional misconduct ... limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious

ord, process, and report financial data consistent with the assertions of management in the financial statements."

that the defendant must have been aware of it.

*Id.* at 408 (citing *Broad v. Rockwell,* 642 F.2d 929, 961–62 (5th Cir.1981) (en banc) (internal citations omitted)). Mere negligence will not satisfy the scienter requirement. *Id.* at 407 n. 7 (citing *Hochfelder,* 425 U.S. at 199–200, 96 S.Ct. 1375). Plaintiffs may establish a strong inference of scienter by circumstantial evidence. *Id.* at 410.

"Strong inference" is an amorphous standard that tends to defy strict definition. The Second Circuit opined that the "complexity and uncertainty" that surround application of the strong inference standard arises from the "inevitable tension between the interests in deterring securities fraud and deterring strike suits." *Novak v. Kasaks,* 216 F.3d 300, 307 (2nd Cir.2000). One court, applying the ordinary legal meaning of "strong" and "inference," concluded that "for securities fraud plaintiffs to plead a strong inference of the required state of mind, they must allege with particularity facts that, assumed to be true constitute persuasive, effective and cogent evidence from which it can logically be deduced that defendants acted" with the required mental state.[29] *Coates v. Heartland Wireless Communications, Inc.,* 100 F.Supp.2d 417, 422 (N.D.Tex.2000); *See also In re MCI Worldcom, Inc. Securities Litigation,* 191 F.Supp.2d 778, 783 (S.D.Miss.2002) (quoting the *Coates* "strong inference" definition). However, in addition to the ordinary meaning of "strong inference," courts must also consider the PSLRA's purpose. The Fifth Circuit has declared:

The PSLRA was enacted, in part, to compensate for the perceived inability of Rule 9(b) to prevent abusive, frivolous strike suits. It was not enacted to raise the pleading burdens under Rule 9(b) and section 78u–4(b)(1) to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed on Rule 9(b) and 12(b)(6) motions.

*ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 354 (5th Cir.2002).

*Do the facts alleged support a strong inference of scienter?*

 Plaintiffs have pled that Defendants made several false representations to investors. Plaintiffs allege that by using POC accounting, Defendants represented that EDS had completed 23% of the NMCI Contract when in fact it had only completed 5%. Plaintiffs also allege that EDS, through Brown and Daley, represented that EDS financial results for 2001 and most of 2002 were accurate despite the fact that EDS had improperly used POC accounting to recognize significant unearned revenues. Furthermore, Defendants issued a press release including $10 million of allegedly unearned revenue from the NMCI Contract in February 2001. Finally, Brown and Daley regularly issued press releases and convened conference calls with investment analysts in which they affirmed EDS' positive earnings from the NMCI Contract as reported in quarterly earnings reports, while failing to reveal the severe problems on the NMCI Contract.

In the present case, the Plaintiffs have pled facts sufficient to show that there

---

**29.** The *Coates* court defined 'inference' as a "conclusion reached by considering other facts and deducing a logical consequence from them." *Coates,* 100 F.Supp.2d at 422 (citing Blacks Law Dictionary at 781 (7th ed.).

The court defined 'strong' as "[p]ersuasive, effective and cogent." *Id.* (citing Webster's II New Riverside University Dictionary at 1149)).

were serious problems on the NMCI Contract. As pled by Plaintiffs, the NMCI Contract was plagued with problems due to EDS' inability to transfer legacy software to the new system. The Navy deferred approximately $628 million in orders due to non-compliance and EDS ultimately proceeded with an alleged "scorched earth" policy whereby it intentionally produced as many seats as possible regardless of whether they met NMCI Contract specifications. Ultimately, Congress intervened to stop EDS' scorched earth policy.

Plaintiffs allegations also contend that Brown and Daley, the principle actors in this lawsuit, had personal knowledge regarding the NMCI Contract's status. Plaintiffs have alleged that the NMCI Contract was the largest contract in EDS' most important line of business, and that, as the largest outsourcing project ever engaged by the United States Government, the $6.9 billion project was the fourth most significant event in EDS' history. Moreover, Brown and Daley represented to the SEC that they personally designed EDS' internal control procedures to ensure that they were aware of all material financial information. Finally, Plaintiffs allege that Brown and Daley received daily reports on the NMCI Contract's status and convened monthly telephone conference calls to review actual budget results for company projects including the NMCI Contract.

Contrary to Defendants' assertion, this is not a case where Plaintiffs try to impute knowledge of problems with the NMCI Contract to Brown and Daley simply because of their corporate positions. First, and perhaps most importantly, Plaintiffs have pointed to specific meetings, reports, and practices whereby Brown and Daley were made actually aware of the NMCI Contract's status. For the purposes of this motion, the Court accepts those factu-

al allegations as true. *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 341 (5th Cir.2002). Second, the NMCI Contract's sheer magnitude and importance to EDS support an inference that Brown and Daley, the CEO and CFO, would know of its status. Courts have found that defendants have scienter of information that is "so obvious the defendant must have been aware of it." *Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1067 (5th Cir.1994). For example, the Western District of Texas found that defendants knew of operational problems because they were top officers of a company who were responsible for speaking to the public and the problem involved the company's primary client. *In re Netsolve, Inc. Securities Litigation,* 185 F.Supp.2d 684, 697 (W.D.Tex.2001). Similarly, in the present case Brown and Daley are two of EDS' top officers, they are primarily responsible for disseminating information to investors, and the Navy is one of EDS' largest clients. Additionally, problems would have been more obvious here than in *Netsolve* because the United States House of Representatives and the IDA investigated and reprimanded EDS for poor performance on the project.

Having established that Defendants knew of problems that existed on the NMCI Contract, the Court concludes that Plaintiffs have pled sufficient facts to show that Defendants made misrepresentations or omissions to investors with the required scienter. Plaintiffs have alleged that, prior to the NMCI Contract, EDS reduced $200 million in earnings that it had reported under POC accounting in a project for Xerox because of unexpected costs. Also, Plaintiffs contend that before the NMCI Contract, EDS acknowledged that it improperly continued to recognize costs as revenues under POC accounting despite knowledge that it could not complete the project for Golden Cross. Taking these

allegations as true, as the Court must, EDS was in fact aware that recognizing costs as revenue under POC in a project with cost overruns and implementation problems was improper and would overstate revenues. These allegations, compounded with the allegation that Brown and Daley had direct personal knowledge of the implementation problems, delays, and cost overruns raises a strong inference that it was at the very least extremely reckless to continue to recognize costs as revenue. The Court also finds a strong inference that Defendants were extremely reckless in continuing to recognize any revenue on the project when they were allegedly pursuing a tactic of intentionally providing goods that did not meet contract specifications.

This ruling is consistent with the holding in *Nathenson v. Zonagen.* In *Nathenson,* the plaintiffs alleged that the defendant company and some of its directors defrauded their shareholders by issuing a series of public misrepresentations that artificially inflated Zonagen's stock price. *See Nathenson,* 267 F.3d at 404. Specifically, the patent at issue in *Nathenson* was a method of use patent covering items dissolved in the mouth, but excluding those swallowed and dissolved in the stomach. *Id.* at 423. In a June 24 press release, Defendants represented that the patent covered their drug even though their drug was at all times intended to be administered as a pill to be swallowed. *Id.* Additionally, defendant Podolski, Zonagen's

president and CEO, in a *Fortune* article declared that the patent "broadly covered" Zonagen's drug. *Id.* at 425. The court found that because Podolski knew that the drug was intended to be swallowed, he and Zonagen acted with scienter when they represented that the patent covered the drug. *Id.* at 426. In the present case, Plaintiffs have adequately pled that Brown and Daley knew that the NMCI Contract was not generating revenues but continued to issue press releases and earnings statements to the contrary. Moreover, in this case Plaintiffs have pled facts showing that EDS, from prior experience, should have known that continuing to recognize profits on the NMCI Contract would ultimately lead to a substantial profit restatement.

*Defendants' objections*

Although this Opinion has implicitly addressed most of Defendants' arguments, the Court will specifically address a few of Defendants' other points. First, Defendants' argument that Plaintiffs cannot rely on publicly disclosed information to establish scienter misses the point of the scienter inquiry. Defendants argue that a June 2002 report by the House Committee on Appropriations issued by the Government Printing Office on June 25, 2002,[30] an IDA independent analysis of the NMCI Contract available on the IDA website,[31] and an email outlining EDS' scorched earth policy reprinted in *Computerworld* magazine[32] cannot establish that the defendants acted with scienter because they were pub-

---

**30.** The June 2002 report, discussed in the background facts section of this opinion, generally concluded that there were severe defects in the implementation of the NMCI Contract, questioned EDS' representations that the NMCI intranet was "ready for widespread deployment," found that "excepts from [EDS'] report are indicative of this questionable conclusion and clearly demonstrate the shortcomings of testing," and recommended that additional orders under the NMCI con-

tract wait until testing confirmed that EDS had proved that even 5% of the seats were fully operational and compliant with the NMCI Contract.

**31.** The IDA report is discussed in the background facts section of this opinion.

**32.** The Hatcher email is discussed in the background facts section of this opinion.

lic knowledge.[33] Defendants misunderstand that all of these documents tend to show that there were in fact problems with the NMCI Contract, and nothing more. When coupled with allegations that Defendants knew of those problems with the NMCI Contract and thereafter misrepresented the NMCI Contracts' status, the documents do support an inference of scienter. The fact that the documents were publicly available may affect Plaintiffs' reliance on or the materiality of the information contained therein, but it does not mean that Defendants did not act with scienter when they made knowing misrepresentations to investors.[34]

Similarly, Defendants' argument that the IDA report, House committee report, and Hatcher email do not support scienter because Plaintiffs' alleged that EDS stock was traded on an efficient market is without merit. The "efficient market" allegation suggests that all available information is immediately absorbed by the market and reflected in a stock's market price. *Eckstein v. Balcor Film Investors,* 8 F.3d 1121, 1129 (7th Cir.1993). However, pleading that securities are traded on an "efficient" market affects the reliance element but not the scienter element. *See ABC Arbitrage Plaintiffs Group,* 291 F.3d at 361; *Nathenson,* 267 F.3d at 415 (finding that the efficient market pleading relates to the reliance element of a securities fraud claim). Simply because the market may have factored the three documents' information into the share price does not convince the court that Defendants did not act with scienter when they misrepresented earnings. The Court is unwilling to hold that defendants who allegedly acted knowingly in misrepresenting a company's finances did not do so intentionally because investors are presumed to have known that defendants were in fact not being truthful. The fact remains that, based on the Complaint's allegations, Defendants knowingly misrepresented EDS' finances, and Defendants cannot argue that they did not have the required mental state because Plaintiffs should have known that they were being less than truthful.

Third, Defendants' argument that the Court should not consider Plaintiffs' allegation that EDS represented it had completed 23% of the NMCI Contract when it had not even provided 5% of the required workstations is an improper attempt to raise a fact issue in a Rule 12(b)(6) motion to dismiss. Even though the PSLRA imposes a higher pleading standard for scienter, courts are to take all factual allegations in the plaintiffs complaint as true. *See ABC Arbitrage Plaintiffs Group,* 291 F.3d at 341. Plaintiffs have alleged that the purpose of POC accounting is to recognize revenue as the percentage of the project completed. Thus, when Plaintiffs allege that EDS has recognized 23% of the expected revenue on the NMCI Contract under POC accounting ($1.6 billion out of $6.9 billion), the Court accepts as reasonable Plaintiffs' allegations that EDS represented it had completed 23% of the project. The Court will not resolve a fact issue regarding how the market interpreted EDS' POC accounting statements at this stage of the proceedings.

Fourth, at this stage of the proceedings, the Court will not resolve the fact issue of whether EDS' use of POC accounting was proper on the NMCI Contract. Plaintiffs

---

**33.** Defendants assert that "the public availability of this material makes it difficult to understand how any of it could support an inference that Defendants were engaged in securities fraud at the time."

**34.** The Court does not address reliance or materiality in this Opinion because Defendants have not challenged reliance or materiality in their motion.

allege that POC accounting was improper because EDS could not dependably estimate costs on the NMCI Contract due to the project's pervasive problems and because EDS did not have adequate assurance that it would break even on the NMCI Contract, due to the abnormally low profit margin it calculated in its bid. Taken as true, these factual allegations show that POC accounting was improper under these circumstances. The Court will not indulge Defendants attempt to overcome plaintiffs allegations with argument in a Rule 12(b)(6) motion to dismiss. The facts *as pled* support an inference of scienter.

### Have the Plaintiffs adequately pled causation?

Because the PSLRA does not affect causation pleadings, Plaintiffs' causation pleadings must only meet the traditional "fair notice" standards. Dismissal under 12(b)(6) is only appropriate if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The complaint will not be dismissed unless it appears beyond a doubt that Plaintiffs can prove no set of facts that would entitle them to relief. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.,* 677 F.2d 1045, 1050 (5th Cir.1982).

The Court finds that Plaintiffs have adequately pled causation. To ultimately recover, Plaintiffs must prove that the misrepresentations touch on the reasons for the decline in EDS' stock value, and that the misrepresentations are the proximate cause of the stock value decline. *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 626 (N.D.Tex.1998) (citing

*Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1117 (5th Cir.1988), *rev'd on other grounds sub nom., Fryar v. Abell,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989)). Here, to survive a Rule 12 motion to dismiss, "Plaintiffs need only allege facts which show that Defendants' omissions and misrepresentations caused the market price of the stock to be artificially inflated, and therefore to appear to be a good risk for investment, so that when the truth came out about the company's condition, the stock lost value and Plaintiffs suffered a loss." *Id.; See also Broudo v. Dura Pharm., Inc.,* 339 F.3d 933, 938 (9th Cir. 2003). Based on the allegations already discussed at length, the Court finds that Plaintiffs have adequately pled that Defendants' misrepresentations inflated the stock value such that the stock value decreased when investors learned of the problems with the NMCI Contract.

The Court rejects Defendants' argument that Plaintiffs have not adequately pled causation because the September 18 press release did not mention the NMCI Contract. It is undisputed that the September 18 press release, marking the end of the proposed class period, indicated that EDS revenues fell due to many problems the company had, but did not mention the NMCI Contract.[35] Despite the fact that Plaintiffs have connected at least a portion of the stock price fall to the NMCI Contract by their allegations and with evidence that market analysts connected the two, EDS argues that Plaintiffs have not pled causation because EDS' own September 18 press release did not connect the revenue decline to the NMCI Contract. In other words, EDS argues that a plaintiff can never adequately plead a cause of

---

**35.** The problems stated in the September 18 press release included: larger then expected declines in discretionary spending by EDS' clients, the bankruptcy of EDS' client U.S. Airways, and the underperformance of certain European contracts.

action so long as a defendant does not admit that its fraudulent activity caused the alleged harm. The Court does not accept Defendants' argument. Defendants cannot escape liability for fraud simply by not admitting the fraud.

Similarly, the Court rejects Defendants' attempts to raise a fact issue on causation in a Rule 12 motion to dismiss. Defendants try to persuade the court that the stock price fall resulted from the problems EDS actually disclosed in the September 18 press release, and not from problems on the NMCI Contract. The Court will not resolve that factual question at this stage of the proceedings. Plaintiffs have alleged that the NMCI Contract caused the stock price fall, and the Court is obligated to accept that allegation as true.[36]

## SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

The Court holds that Plaintiffs have adequately pled a cause of action under § 20(a) of the Securities Exchange Act of 1934. Defendants only argument to the contrary is that the "primary" Section 10(b) violation "must be dismissed for failure to plead scienter and loss causation" and thus the § 20(a) claim cannot survive.[37] Having concluded that Plaintiffs have adequately pled scienter and loss causation, the Court rejects Defendants' argument.

---

**36.** Defendants also mischaracterize Plaintiffs argument. Defendants claim that Plaintiffs ask the Court to infer that "EDS's stock actually would have lost less after September 18, had the NMCI Contract never existed." While that may indeed be an irrational inference, it is not what Plaintiffs allege. Plaintiffs allege that EDS stock would have lost less after September 18 had Defendants not artificially inflated the stock value by fraudulently hiding problems with the NMCI Contract.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' motion to dismiss. The Court holds that Plaintiffs have adequately pled the challenged scienter and causation elements under § 10(b) and the PSLRA. Furthermore, the Court holds that Plaintiffs have pled a valid derivative cause of action under § 20(a).

---

**37.** Under § 20(a): "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a) (2003).